MEMORANDUM OPINION
 

 MICHAEL, District Judge.
 

 On April 15, 1996, United States Magistrate Judge B. Waugh Crigler issued an Order (incorporating a hearing and an oral ruling made on April 12, 1996), denying the motion for summary judgment filed by Defendants Warren County Sheriffs Department (“Sheriffs Department”) and Warren County Sheriff Lynn Armentrout (“Sheriff’). The Magistrate ruled that Plaintiff Deborah Blankenship’s claims under Title VII, 42 U.S.C. § 2000e
 
 et seq.
 
 and 42 U.S.C. § 1983, alleging unlawful gender-based discrimination in the work place, should go to trial because the Magistrate found “genuine is
 
 *454
 
 sues of material fact as to every issue of liability in [the] case.” Transcript of April 12, 1996, at p. 60. Further, the Magistrate concluded that the Sheriff was not entitled to qualified immunity on the § 1983 claim against him because if the Sheriff was motivated by a gender-based bias (which was yet to be established), he could not invoke the defense of qualified immunity. Defendants filed timely objections to the Magistrate’s Order. Thus, this court is required to undertake de novo review of the case under
 
 Orpiano v. Johnson,
 
 687 F.2d 44, 48 (4th Cir. 1982). For the reasons stated below, the court overrules the Magistrate’s Order and grants defendants’ motion for summary judgment pursuant to Fed.R.Civ.P. 56. Because of the court’s holding, the issue whether the Sheriff is entitled to invoke the defense of qualified immunity is moot.
 

 I.
 

 In December 1986, the Sheriff hired plaintiff to work as a road dispatcher for the Sheriff’s Department. Plaintiff remained in that position until January 1991, when the Sheriff promoted plaintiff to the position of road deputy. In July 1993, the Sheriff fired plaintiff, and, subsequently, plaintiff brought suit under Title VII
 
 [1]
 
 and § 1983,
 
 [2]
 
 alleging that she was discharged because she is female, in violation of Title VII and the Equal Protection Clause of the Fourteenth Amendment.
 
 [3]
 
 Defendants claimed that plaintiffs job performance, and not gender, was the reason for plaintifPs termination. They moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure and argued that the Sheriff was entitled to invoke the defense of qualified immunity against plaintiffs § 1983 claim.
 

 There is no dispute that during her tenure as a road dispatcher, plaintiff was reprimanded on ten separate occasions for her poor attitude toward the public, the sarcasm she directed toward supervisors, and exercise of poor judgment on the job. Two female supervisors, Sergeants Jean Boone and Ruth Golden, were partially responsible for disciplining plaintiff. Notwithstanding these problems, plaintiff applied for and received a promotion to road deputy. Approximately one year later, plaintiff complained that Deputy Harry Wines, a man with whom she had earlier had an affair, was harassing her. As a result Captain William Chapman, one of plaintiffs supervisors, demoted Deputy Wines and placed him on disciplinary probation for six months. Aside from this incident, in her position as road deputy plaintiff neither complained about anyone else nor suffered any adverse employment action in the course of two years (from 1991 to 1993).
 
 [4]
 
 In February 1993, in the span of a two week period, the Sheriffs Department received three separate complaints from civilians, claiming that plaintiff had verbally abused them. The first complainant was a woman— whom plaintiff had been helping move belongings from her apartment — who had been told by plaintiff to “shut up and get the hell out.” Plaintiff tried to apologize subsequently. Regarding the second instance, plaintiff conceded (in writing) that she “did get verbally abusive ... and overreacted.” Finally, in the third incident, plaintiff hollered at an elderly woman she had pulled over; Deputy Teresa Flannigan — the female officer riding with plaintiff — verified the elderly woman’s account.
 

 Plaintiff explained to Captain Chapman that personal problems at home accounted for her misconduct. Captain Chapman responded by placing plaintiff on one year’s disciplinary probation, a punishment plaintiff decided not to appeal because she “respected
 
 *455
 
 Captain Chapman’s position and left it at that.” PL’s Dep. at 190-91. Approximately four months later, plaintiff destroyed her police ear in pursuit of a vehicle that was exceeding the maximum speed limit. Traveling up to eighty miles per hour on a hilly, curving highway, plaintiff activated her emergency equipment, deactivated it because she feared she was putting herself and other citizens in danger, and reactivated it when two citizens pointed in the direction of the speeding car. Ultimately she did not catch the suspect, but flew over an embankment and into a fence. PL’s Dep. at 213-229. Plaintiffs pursuit violated various departmental policies and procedures;
 
 [5]
 
 more basically, plaintiffs adventure put her life, and that of others, in danger.
 
 [6]
 
 After consultation with the County Attorney and the Senior Assistant Attorney General for employment matters in Virginia, Captain Chapman recommended to the Sheriff that plaintiff be terminated because her accident (in violation of departmental policies) occurred while she was on disciplinary probation.
 
 [7]
 
 The Sheriff offered to permit plaintiff to resign, but plaintiff declined to do so and appealed her termination. During the hearing that followed, plaintiff made no accusation against the Sheriffs Department, the Sheriff, or any of the Department’s employees that she had been the victim of sex discrimination. Instead, plaintiff argued that she had violated no departmental policies and that her actions were justified. Sheriff declined to accept these arguments and fired plaintiff.
 

 On July 27, 1993, plaintiff lodged a complaint with the Equal Employment Opportunity Commission (“EEOC”), and filed suit on July 17, 1995. Plaintiff contends that her discharge was not motivated by any alleged misconduct or policy violations, but rather was the result of a gender-based bias defendants harbored against her. Her allegation is based almost entirely on various statements she attributes to the Sheriff, Captain Chapman, and her immediate supervisor, Sergeant George Cleveland. Plaintiff claims that in 1987 or 1988, several years after she began her employment with the Sheriffs Department, the Sheriff advised her that road deputies only “came out of jail and that women would not be allowed to work in the jail” (because of privacy concerns) and “that although he was concerned about all of his patrol officers, that he would be more so concerned about a woman being on patrol.” In 1989, the Sheriff issued a notice to “Deputized Female Office Personnel”; the title aside, the content of the memo was gender neutral. In her interview for the position of road deputy, plaintiff was asked how she could handle herself on the road and how she would conduct herself in a fight; plaintiff discerns a gender bias in such questions. According to plaintiff (who did not personally hear these remarks), Captain Chapman declared that as long as he was there, women would not be allowed to work in investigations and that women would not be allowed to set foot on the firing range (plaintiff concedes, however, that Captain Chapman in fact supervised her on the firing range without incident). Sergeant Cleveland allegedly called plaintiff Robobitch, remarked that she was “a typical female driver,” and, after
 
 *456
 
 plaintiff was discharged, “joked” that “we’re an equal opportunity employer. We have a black, we had a female, and now we have a faggot.” Sergeant Cleveland further advised plaintiff that because of male “motchoism [sic],” “a man can cuss a man,” but a man could not cuss at a woman and a woman could not cuss at a man without some sort of backlash; he also criticized plaintiff for her moodiness and worry for her family, and complimented her paperwork skills; plaintiff believes such commentary reveals gender bias. Finally, plaintiff insists that she was disciplined more harshly for alleged misconduct than her male colleagues.
 
 [8]
 

 II.
 

 Summary judgment under Fed. R.Civ.P. 56 is appropriate only where there are no genuine disputes of material fact and when the moving party is entitled to judgment as a matter of law.
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists.
 
 Id.
 
 at 248,106 S.Ct. at 2510. All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant.
 
 Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The substantive law of the underlying claim(s) will determine what are the material facts; factual disputes that cannot affect the outcome of the case should be disregarded by the court in deciding whether summary judgment should issue.
 
 Liberty Lobby,
 
 477 U.S. at 248, 106 S.Ct. at 2510. Nor will pure speculation and unsupported assertions suffice to create a genuine issue of material fact; the nonmoving party, to defeat summary judgment, must come forward with affidavits, interrogatories, depositions, and or other admissible evidence demonstrating the existence of a genuine issue of material fact.
 
 Celotex Corp v. Catrett,
 
 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986);
 
 Sylvia Dev. Corp. v. Calvert County, Maryland,
 
 48 F.3d 810, 817 (4th Cir.1995). ‘Where no genuine issue of material fact exists, the Fourth Circuit has imposed an obligation on the trial court ‘to prevent factually unsupported claims ... from proceeding to trial.’ ”
 
 Doyle v. Sentry Ins.,
 
 877 F.Supp. 1002, 1005 (E.D.Va.1995) (one set of internal quotations omitted) (quoting
 
 Felty v. Graves-Humphreys Co.,
 
 818 F.2d 1126, 1128 (4th Cir.1987)). Although care should be taken in granting summary judgment in cases where motive plays a critical role in the claim, caution should not preclude summary judgment when plaintiff cannot succeed as a matter of law on her claim.
 
 See Mitchell v. Data General Corp.,
 
 12 F.3d 1310, 1316 (4th Cir.1993).
 

 III.
 

 “Intentional discrimination [or disparate treatment in employment] cases fall within one of two categories: ‘pretext’ cases and ‘mixed-motives’ cases.”
 
 Fuller v. Phipps,
 
 67 F.3d 1137, 1141 (4th Cir.1995) (Title VII) (internal quotations and citations omitted). The latter requires a plaintiff to present direct evidence that an adverse employment action was motivated, at least in part, by the employee’s sex. Once a plaintiff produces such evidence and the fact-finder credits it, she has, to some extent, succeeded in her case: “an unlawful employment practice is established when the complaining party demonstrates that ... sex ... was a motivating factor for any employment practice, even though other factors also motivated the practice.” 42 U.S.C. § 2000e-2(m). At this stage, the employer cannot escape liability, but can limit remedies available to the victim, if the employer satisfies the burden of showing that the same adverse employment action would have been taken absent the discriminatory reasons. 42 U.SiC. § 2000e-
 
 *457
 
 5(g)(2)(B). More commonly, when no direct evidence of discrimination is forthcoming, employees alleging sex discrimination must proceed under the less generous organizational framework of
 
 McDonnell Douglas v. Green,
 
 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which permits them to offer circumstantial evidence to prove that the employer’s justification for the adverse employment action is pretextual and that, more likely than not, sex-based discrimination motivated the adverse employment action.
 
 [9]
 

 IV.
 

 Plaintiff maintains that the various statements made by the Sheriff, Captain Chapman, and Sergeant Cleveland, discussed above, constitute direct evidence that she was discharged because of her sex. The court cannot agree. Evidence that might be probative of discrimination is not necessarily direct evidence of a discriminatorily motivated discharge.
 
 Fuller,
 
 67 F.3d at 1142 (‘“Simply because a discriminatory reason might be inferred ... does not mean that a mixed motive case exists.’ ”) (quoting
 
 Schleiniger v. Des Moines Water Works,
 
 925 F.2d 1100, 1101 (8th Cir.1991) (Title VII)). In the Fourth Circuit, “[w]hat is required ... is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude
 
 and that bear directly on the contested employment
 
 decision.”
 
 Fuller,
 
 67 F.3d at 1142 (emphasis added). “‘Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact ... without any inference or presumptions.’ ”
 
 O’Connor v. Consolidated Coin Caterers Corp.,
 
 56 F.3d 542, 548-19 (4th Cir. 1995) (Age Discrimination in Employment Act (“ADEA”)) (quoting
 
 Bodenheimer v. PPG Indus., Inc.,
 
 5 F.3d 955, 958 (5th Cir. 1993) (“ADEA”)).
 

 Assuming for the moment that the statements adduced by plaintiff reflect gender bias, none of the statements have any relation to her discharge. Although pejorative remarks may evidence discrimination, stray or isolated remarks unconnected to the negative employment decision will not be deemed direct evidence of discrimination.
 
 Consolidated Coin Caterers,
 
 56 F.3d at 548-549 (holding that the following remarks did not constitute direct evidence of age discrimination: “[i]ts about time we get some young blood in this company”; “[plaintiff], you are too damn old for this kind of work”; and “[plaintiff, you are just] too old [to play golf]”). Some “nexus [is required] ... between the alleged discriminatory statements and any of the employment decisions made by the [employer].”
 
 EEOC v. Clay Printing Co.,
 
 955 F.2d 936, 940 (4th Cir.1992) (ADEA). This is so even when the disparaging comments come from the ultimate decision maker or influential supervisors.
 
 Consolidated Coin Caterers,
 
 56 F.3d at 549 (citing
 
 Merrick v. Farmers Ins. Group,
 
 892 F.2d 1434, 1438-39 (9th Cir.1990) (ADEA)). “[R]emoteness in time” reduces the probative value of the derogatory statements, “mak[ing] it inappropriate to use [them] as evidence of [sex] discrimination.”
 
 Birkbeck v. Marvel Lighting Corp.,
 
 30 F.3d 507, 512 (4th Cir.1994) (ADEA) (citing with approval
 
 Phelps v. Yale Sec., Inc.,
 
 986 F.2d 1020, 1026 (6th Cir.1993) (ADEA), which found that a discriminatory statement made one year before an adverse employment decision was too remote in time).
 

 All of the Sheriffs allegedly discriminatory statements — including the memo to
 
 female
 
 deputized officers, his assertion that women would not be allowed to work in jails, and his expressed concern for female patrol officers, greater than that for males — were made between four to six years before plaintiffs discharge. Aside from the gulf in time between plaintiffs discharge and the comments, it is clear that the statements have no bearing on plaintiffs discharge. Plaintiff never applied to work in the jail; although she contends that the Sheriff usually gave road deputy positions to those who had previously worked in jails, plaintiff had never worked in a jail and was nonetheless promot
 
 *458
 
 ed to road deputy. Nor did the Sheriffs heightened concern for women prevent him from promoting plaintiff. Finally, the memo directed to females, while unusual in the sense that its caption indicates gender while the text of the memo is gender-neutral in the requirements it sets out, is insufficient to create a genuine issue of material fact that would defeat summary judgment, given that several years separate it and plaintiffs discharge.
 

 Captain Chapman’s statements cannot be relied upon to avoid summary judgment because they would be inadmissible at trial as double or triple hearsay, and only evidence admissible at trial can be considered on a summary judgment motion.
 
 Evans v. Technologies Applications and Service Co.,
 
 80 F.3d 954, 962 (4th Cir.1996) (citing The
 
 Maryland Highways Contractors Ass’n v. Maryland,
 
 933 F.2d 1246, 1251-52 (4th Cir.1991)).
 
 [10]
 
 Moreover, Captain Chapman’s alleged assertions that women would not be allowed on the firing range or on investigations are wholly unrelated to plaintiffs discharge. Plaintiff makes no claim that Captain Chapman did not allow her to engage in investigations or that he did not permit her to enter the firing range. Nor could plaintiff make such a claim, since Captain Chapman
 
 did
 
 allow her to enter the firing range and, indeed, supervised her there without ever treating her differently because she was a woman by plaintifPs own account. PL’s Dep. at 70. Additionally, plaintiffs discharge was entirely unconnected to any activity on the firing range or her investigatory skills.
 

 Finally, of the three supervisors, Sergeant Cleveland had the least to do with plaintiffs discharge, which was recommended by Captain Chapman and authorized by the Sheriff. In fact, plaintiff would be hard-pressed to show any direct effect on her firing exerted by Sergeant Cleveland.
 
 [11]
 
 Some of his remarks (regarding women, blacks, and “faggots,” as well as the appellation “Robo
 
 *459
 
 bitch”
 
 [12]
 
 ), clearly tasteless and even prejudiced, reveal an unappealing character, but have no conceivable nexus with Captain Chapman’s recommendation, and the Sheriffs subsequent approval, that plaintiff be fired. Moreover, plaintiff admitted that Sergeant Cleveland never treated her differently because she was a woman, aside from the comments to which she points.
 

 Because none of the statements to which plaintiff points could permit a fact-finder to conclude, “without inference or presumptions,”
 
 Consolidated Coin Caterers,
 
 56 F.3d at 548-49, that her discharge was motivated by sex, plaintiff has failed to present any direct evidence of discriminatory discharge.
 
 [13]
 

 V.
 

 Having found that plaintiff has failed to produce direct evidence of discrimination, the next step is to analyze plaintiffs case under the burden-shifting scheme set out in
 
 McDonnell-Douglas, Texas Department of Community Affairs v. Burdine,
 
 450 U.S. 248, 253, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981), and
 
 St. Mary’s Honor Ctr. v. Hicks,
 
 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Usually a prima facie case is established under
 
 McDonnellrDouglas
 
 with a showing that plaintiff (1) belongs to a protected class; (2) was performing her job adequately; (3) suffered an adverse employment action; and (4) was replaced by someone not a member of the protected class. Once a plaintiff has met the light burden of
 
 McDonnellr-Douglas,
 
 the defendant must articulate a legitimate, nondiseriminatory reason for the adverse employment action; only the burden of production, not persuasion, shifts to the defendant. If the defendant succeeds with this relatively easy task, the burden shifts back to the plaintiff to demonstrate that the real reason for the adverse action was discriminatory and the reason offered false.
 
 Hicks,
 
 509 U.S. at 519, 113 S.Ct. at 2753-54.
 

 The
 
 McDonnellr-Douglas
 
 framework is not meant to be applied rigidly; its purpose is simply to weed out early on the most basic nondiscriminatory reasons for adverse employment actions and to ease the burden of showing unlawful disparate treatment.
 
 See Birkbeck,
 
 30 F.3d at 511. Common sense should not be thrown out the window in favor of ritualistic adherence to the original criteria of
 
 McDonnell-Douglas. See Moore v. City of Charlotte,
 
 754 F.2d 1100, 1105 (4th Cir.1985) (Title VII). Hence, defendants’ contention in this case that plaintiff has not articulated a prima facie case because her job performance was inadequate must be rejected. Plaintiff contends that her firing was based on sex, because, in turn, the disciplinary probation that led to her discharge was based on her sex; according to plaintiff, males engaged in misconduct similar to that which purportedly resulted in her probation, but were not punished as harshly as she. If so, plaintiff suffered disparate treatment, even assuming her job performance was inadequate.
 
 See Cook v. CSX Transp. Corp.,
 
 988 F.2d 507 (4th Cir.1993) (Title VII).
 

 Moore
 
 offers a modified version of
 
 McDonnellr-Douglas:
 
 to make out a prima facie case, it is sufficient for plaintiff to show
 
 *460
 
 (1) that she is a member of a protected class; (2) that she engaged in misconduct similar to that of a person not a member of the protected class; and (3) that she was dealt with more severely.
 
 Moore,
 
 754 F.2d at 1105-06. Plaintiff satisfies the first two criteria — she is a member of a protected class and male officers have engaged in conduct similar to that for which plaintiff was placed on disciplinary probation. However, plaintiff cannot meet the third criterion. Defendants have produced evidence showing that the punishment imposed upon plaintiff fell within a spectrum of discipline. While every case of discipline varies a bit from the next, the cases are certainly not beyond comparison. Probably the harshest discipline was imposed on Deputy Barton (a male), who was given one year’s probation for a single incident of abuse (as compared to plaintiffs three incidents). On the other end of the range, Deputy Will (a female) received a three day suspension for abusive conduct and Deputy Comet (a male) escaped with only a warning and threat of dismissal after four complaints from prison inmates. Arguably in the middle, Deputies Wines and Long (males) were each placed on probation for six months as a consequence of Deputy Long’s alleged harassment of female arrestees and Deputy Wines’ alleged harassment of plaintiff.
 
 [14]
 
 Under the standard of
 
 Cook,
 
 as a matter of law plaintiffs treatment fell within a range of punishment to be doled out for like misconduct.
 
 Cook,
 
 988 F.2d at 511-12 (holding that when one white employee was disciplined more harshly than the plaintiff, who was black, plaintiffs punishment fell within a normal range of discipline).
 

 VI.
 

 Because the Fourth Circuit has repeatedly cautioned courts to avoid becoming overly enthralled with the
 
 McDonnell-Douglas
 
 proof scheme (an admonition not to lose sight of the forest for the trees), the court emphasizes that plaintiff has not presented admissible circumstantial evidence that could permit a reasonable fact-finder to conclude that sex discrimination led to plaintiffs discharge. It is well to recall that the very same Sheriff plaintiff accuses of discrimination hired plaintiff and promoted plaintiff, even despite her poor disciplinary history.
 
 See Tyndall v. National Educ. Centers,
 
 31 F.3d 209, 215 (4th Cir.1994) (Americans with Disabilities Act (“ADA”)) (stating that there attaches a “strong inference of nondiscrimination when the hirer and firer are the same person”) (citing
 
 Proud v. Stone,
 
 945 F.2d 796, 797 (4th Cir.1991) (ADEA case)). The Sheriffs statements upon which plaintiff bases her discrimination allegation were made some four to six years before plaintiffs discharge; as such they are too remote in time to be probative. For the first two years in her position as road deputy, no one ever disciplined plaintiff; as the court in
 
 Herbig v. International Business Machines, Inc.,
 
 796 F.Supp. 865, 866 (D.Md.1992) (Title VII, ADEA, and ADA), observed, “it just does not wash in the tub of common sense” for discriminatory discipline suddenly to appear after none had been imposed for a prolonged period of time. Captain Chapman and Sergeant Cleveland never treated plaintiff differently from other officers because she was a woman, as far as plaintiff was aware. The latter made some gender-biased remarks— for instance, he told plaintiff she was a “typical female driver” — but had little to do with plaintiffs discharge. Plaintiffs own admissions about moodiness and family problems were repeated to her. Such observations, compliments on paperwork skills (which plaintiff herself agrees she has), and interview questions that seek information about how plaintiff would conduct herself on the road or in a fight simply do not evince gender bias, and no reasonable trier of fact could conclude otherwise. While plaintiff argues moodiness, concern over family, and the like are “typical stereotypical female characteristics,” plaintiff happens to possess such traits.
 
 *461
 
 If these characteristics are interfering with plaintiffs work, surely the Sheriff and the Sheriffs Department are not precluded from criticizing plaintiff because it so happens that other females are also thought to be moody and family-oriented by virtue of the stereotype of which plaintiff complains.
 

 Plaintiff had been reprimanded — by male and female supervisors — for poor attitude, sarcasm and bad judgment. Citizens (men and women) complained about her conduct. She was involved in various (minor) car accidents. At least one major accident involved departmental policy violations, endangerment of life and property, and the destruction of her ear. No reasonable fact-finder could plausibly conclude that the stated reason for plaintiffs discharge — related to job performance — was pretextual and the real reason a discriminatory one.
 

 VII.
 

 For all the reasons stated above, the court holds that the Magistrate’s Order should be overruled and defendants’ motion for summary judgment granted.
 

 An appropriate Order shall this day issue.
 

 [1]
 

 . Title VII prohibits "discharge ... because of [an] individual's ... sex.” 42 U.S.C. § 2000e-2(a).
 

 [2]
 

 . Section 1983 supplies a cause of action for violations of federal law by state actors.
 

 [3]
 

 . The Fourteenth Amendment guarantees all citizens "equal protection of the laws.” U.S. Const, amend. XIV, § 2.
 

 [4]
 

 . Apparently, shortly before plaintiff was discharged, Deputy Wines resumed his allegedly harassing conduct, although not at the Sheriff's Department, but by driving by plaintiff's residence and calling her at home. This fact, typical of many others (too many for the court to list herein), that plaintiff claims is a disputed issue of material fact precluding the grant of summary judgment has no bearing on the matter before the court.
 

 [5]
 

 . One of the violations of which defendants accuse plaintiff assumes that plaintiff was engaged in a “pursuit" of the speeding car, because certain obligations attach when an officer launches a pursuit. Plaintiff denies she was “pursuing” the speeding vehicle. According to plaintiff, the ordinary understanding of “pursuit” is distinguishable from the way in which the Sheriff’s Department defines the term. But plaintiff offers no basis for the court (or any reasonable fact-finder) to conclude that the Sheriff's Department views pursuits any differently than the average lay person; the court has only her unsupported assertion that this is so.
 

 [6]
 

 . Plaintiff had been in six other accidents (some of which were relatively minor) in her two years as a road deputy.
 

 [7]
 

 . The parties quibble about whether plaintiff's accident was the only reason for her discharge, or whether her poor history factored into the analysis. Although it is relatively clear that the accident that occurred during plaintiff's probation was from the start given as the primary motivating factor, defendants assert that plaintiff's past problems influenced their decision. Plaintiff attacks defendants for inconsistency, claiming that they mentioned her past job misadventures only after she filed her complaint with the Equal Employment Opportunity Commission ("EEOC”). Presumably, defendants initially focused on what they saw as the proximate cause of plaintiff’s discharge, i.e., the major automobile accident, rather than contributing causes.
 

 [8]
 

 . Plaintiff also claims that the Sheriff's Department is heavily segregated and that women are paid less than men. The Sheriff does not set the pay rates for employees in the Sheriff's Department' — the Virginia State Compensation Board does. That certain jobs are mainly or only filled by men does not signal gender discrimination, without more. Plaintiff has submitted no evidence on the percentage of qualified females in the relevant labor force; if only 3% of all women in the relevant labor force are interested and qualified, even if 97% of the positions are filled by men, then the alleged segregation cannot be attributed to the Sheriff or the Sheriff’s Department.
 

 [9]
 

 . The analysis is the same, regardless whether the sex discrimination claim is brought pursuant to Title VII or § 1983.
 
 See St. Mary’s Honor Ctr.
 
 V.
 
 Hicks,
 
 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).
 

 [10]
 

 . During oral argument before the court, plaintiff insisted that a letter (in the record) corroborating one of the statements allegedly made by Captain Chapman takes the statements outside of the well-established rule that usually inadmissible hearsay cannot be considered on a summary judgment motion. The letter, however, is authored by Sergeant Golden, who herself did not hear the statement allegedly made by Captain Chapman (but claims, in the letter, that Lieutenant Tennett told her that Captain Chapman made the statement). As such, neither this letter nor the testimony of Sergeant Golden would be admissible at trial. Hence, this case is different from
 
 United States Department of Housing & Urban Development v. Cost Control Marketing & Sales Management,
 
 64 F.3d 920, 926-27 (4th Cir.1995), where admissible evidence laying a foundation for the inadmissible hearsay did not preclude consideration of the latter.
 

 [11]
 

 . Plaintiff, citing
 
 Tuck v. Henkel Corp.,
 
 973 F.2d 371, 377 (4th Cir.1992) (ADEA), argues that when a biased supervisor influences the ultimate decision maker, his allegedly discriminatory statements cannot be dismissed. But, unlike in
 
 Tuck,
 
 there is no evidence here that Sergeant Cleveland affected Captain Chapman’s decision or that of the Sheriff.
 

 In what should be a footnote to this footnote, the court recognizes that plaintiff believes that Sergeant Cleveland influenced her termination because his reprimand of her was reviewed by Captain Chapman. Sergeant Cleveland’s criticism essentially was that plaintiff was moody, worried for her family too much, and used epithets in her arrest of a male suspect. Plaintiff herself explained her admitted moodiness by reference to family problems she suffered. Moreover, the observation that many male arrestees will not take kindly to cursing from female officers is not necessarily evidence of gender discrimination. If it is true that potentially dangerous men will react violently when women (more so than men) curse at them, Sergeant Cleveland surely is correct in warning plaintiff.
 

 Although some believe it is illegitimate for men to react differently depending on the sex of the person with whom they are interacting, others (aside from Sergeant Cleveland and the Sheriff) have pointed out that, like it or not, men and women are different in many ways.
 
 See
 
 Carol Gilligan, In a Different Voice: Psychological Theory and Women’s Development (1982) (concluding that women's moral development differs from that of men and finding that women are more nurturing, caring, place more emphasis on responsibility to others, like to settle disputes without disturbing personal relationships, and see people as interconnected, whereas men tend to view individuals in isolation);
 
 See also Dothard v. Rawlinson,
 
 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (holding that gender might disqualify women from working in a maximum security prison due to potentially violent reactions of male inmates).
 
 But see
 
 Marilyin Frye, The Politics of Reality (1983) (hypothesizing that the gender opposition is a societal construction and that chivalry is a tool for female subordination).
 

 [12]
 

 . The following deposition testimony places Sergeant Cleveland’s name calling in context.
 

 Defense Counsel: Looking at the cartoon that is on document 1000A, I notice it says, Robo of Warren County Sheriff’s Department.
 

 Plaintiff: Yes, sir.
 

 Defense Counsel: What was Robo?
 

 Plaintiff: That was a term that was given to me while I was in the academy in Waynesboro. When the 1992 Chevrolet Caprice came out, it reminded people of the car that was used in Robo Cop, and my nickname in the academy was Robo bitch. (Pl.'s Dep. at p. 116)
 

 Even though the term “bitch" is usually offensive, it is not necessarily gender-based.
 
 See Galloway v. General Motors Service Parts Operations,
 
 78 F.3d 1164, 1168 (7th Cir.1996) (Posner, J.) (Title VII) (reasoning that the term does not insult females as such, but "is simply a pejorative term for ‘woman’ ’’).
 

 [13]
 

 . Plaintiff relies upon
 
 Tuck,
 
 973 F.2d at 377 n. 5, in arguing to the contrary. Plaintiff ignores the fact that
 
 Tuck
 
 did not address the question of what constitutes direct evidence of discrimination. The court explicitly stated that "[a]lthough [plaintiff] argues that his case may be analyzed in either fashion [mixed-motives or pretext], it is examined most profitably for him in the latter manner.”
 
 id.
 
 at 375. The Fourth Circuit proceeded to apply the
 
 McDonnell-Douglas
 
 test to the plaintiff's case.
 

 [14]
 

 . Plaintiff seeks to draw comparisons with other officers involved in vehicular accidents. But these officers were not on disciplinary probation at any point, although Deputy Sutherly was on “initial probation” (triggered by a departmental change), when he swerved to avoid a drunk driver and, in the process, got into a car accident. Clearly, probation that is served due to disciplinary problems and one that is served due to departmental shuffling are two different probations.