# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1131

_____

David Torgerson; Jami Mundell,     *
       *
      Appellants,     *
       *   Appeal from the United States
     v.     *   District Court for the
       *   District of Minnesota.
City of Rochester,     *
       *
      Appellee.     *

_____

Submitted: October 20, 2010
Filed: June 1, 2011

_____

Before RILEY, Chief Judge, and WOLLMAN, LOKEN, MURPHY, BYE, MELLOY, SMITH, COLLOTON, GRUENDER, BENTON, and SHEPHERD, Circuit Judges, En Banc.

_____

BENTON, Circuit Judge.

David Jaye Torgerson and Jami Kay Mundell challenge the City of Rochester, Minnesota's decision not to hire them as firefighters. Torgerson, a Native American, alleges disparate-treatment discrimination based on national origin. Mundell, a female, alleges disparate-treatment discrimination based on gender. They claim that the City violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17, and the Minnesota Human Rights Act (MHRA), Minn. Stat. §§

363A.01–.41 (2006). Torgerson also sues under 42 U.S.C. § 1981. The district court[1] granted summary judgment to the City. A panel of this court reversed, 605 F.3d 584 (8th Cir. 2010), but rehearing en banc was granted. This court now affirms.

I.

A. The Hiring Process

The City of Rochester hires firefighters using a state-statute-driven, civil-service process. In accordance with Minnesota Statute § 420.06, a Fire Civil Service Commission has "absolute control and supervision" over the employment of all officers in the Fire department. The Commission consists of three commissioners appointed by the City Council. Any Commission action requires an affirmative vote by at least two commissioners. Minnesota Statute § 420.07 directs the Commission to adopt rules to carry out its purposes. The rules must provide for "public competitive examinations to test the relative fitness of applicants." Minn. Stat. § 420.07(2).

According to the Commission's Rules, the hiring process begins when the City posts a vacancy, and candidates apply. The City's Human Resources (HR) department first determines whether an applicant meets the application qualifications (citizenship, age, high-school diploma, basic firefighter courses, and Emergency Medical Technician (EMT) status). A candidate then faces a multi-phase process before appointment as a firefighter. Phase I of the process is a written "Standard Firefighter Entry-Level Examination" and "Employment Inventory/Customer Service Inventory," which together count for 30 percent of a candidate's score. Those candidates with the 50 highest Phase I scores advance to Phase II, the physical-agility test. It also counts

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

-2-

for 30 percent of a candidate's score. Candidates earn points in Phase II based on their times to complete a course requiring firefighter tasks. Taking more than six-and-one-half minutes is a failure, disqualifying the candidate. Those passing the Phase II physical-agility test advance to Phase III, an interview with a three-person panel. The panel interview counts for 40 percent of a candidate's score. As required by Minnesota Statute § 197.455, veterans receive additional points (non-disabled veterans get five points, and disabled veterans ten points). Thus, veterans can earn a potential total of 105 (or 110) points, while non-veterans, like Torgerson and Mundell, are capped at 100 points.

Both at their depositions and through counsel, Torgerson and Mundell do not challenge Phases I and II, or the veterans' points. Therefore, details are set out only as to Phase III: One interviewer is a Fire Commissioner, one represents the HR department, and one represents the Fire department. The HR department provides a set of interview questions. A private HR firm gives a class to the interviewers instructing them how to ask questions and what responses are considered good responses. The interviewers receive scoring criteria to use in rating a candidate's responses. The identical questions are asked in the same order by the same interviewer to each applicant. All three panel interviewers score a candidate's responses to each interview question on a scale of 1 to 10. The ten possible questions are also given to the candidates before the interview, by written memo from the private HR firm, along with a list of the qualities the questions relate to.

Based on the scoring from the three phases of the process and the veterans' points, each candidate is placed in rank order on an eligibility list. The Commission then votes whether to certify the eligibility list, which stands for two years. All candidates on the list are qualified for the position of firefighter, although those ranked higher are considered more qualified.

-3-

According to the Rules, when a vacancy is anticipated or occurs, the Fire Chief shall request that the Commission certify to the City Council the names of the persons eligible for appointment. Minnesota Statute § 420.07(7) requires the Commission to certify "the three names standing highest on the appropriate list to fill any vacancy" ("rule of three"). Section 420.07 and the Rules permit–but do not require–the certification of up to two eligible candidates from each "protected group" for which a disparity exists between the make-up of the Fire department and the City's affirmative action goals. Native Americans and women are considered protected groups. This expanded certification is in addition to the rule-of-three certification and is made in rank order.

By the rule of three, the Commission must certify nine candidates for seven open positions. For example, the Commission must certify the first-, second-, and third-ranked candidates for the first position. Then, assuming the Council appoints the highest-ranked candidate for each position, the Commission must certify the second-, third-, and fourth-ranked for the second position; the third-, fourth-, and fifth-ranked candidates for the third position; and so on, until certifying the seventh-, eighth-, and ninth-ranked candidates for the seventh position. The Commission may also certify protected-group candidates in addition to the rule-of-three candidates. However, before appointment, each candidate, including any protected-group candidate, must pass one final stage.

The certified candidates must pass a background check, an interview with the Fire Chief, and medical and psychological examinations. According to the Rules, if a candidate fails any of these, the Commission considers the next qualified candidate on the eligibility list. The City Council makes the final hiring decision, but according to Council Member Patrick Carr, the Council follows the Commission's recommendations. In the past, the City used an expanded certification to hire women and minority firefighters who were not ranked at the top of the eligibility list (and thus ordinarily have no chance of appointment). However, even if a protected-group applicant advances to the Fire Chief interview, the candidate retains his or her original

rank on the eligibility list. Although all candidates on the eligibility list meet the qualifications for the firefighter position, those at the top of the list are recognized as more qualified than those at the bottom.

Ordinarily, the Fire Chief interview is used to determine if Phases I, II, and III missed something that is a reason *not* to hire a candidate. The Fire Chief changes the focus of the interview when interviewing lower-ranked candidates advanced by expanded certification. As to them, the interviews are used to see if the earlier phases missed something that *is* a reason to hire them instead of the highest-ranked candidates.

B. The Challenged Hirings

In the fall of 2005, the City sought to hire seven firefighters. Three of these positions were funded by a federal "Staffing for Adequate Fire and Emergency Response" (SAFER) grant. The grant outlines its purpose:

> The purpose of the SAFER grants is to award grants directly to volunteer, combination, and career fire departments to help the departments increase their cadre of firefighters. Ultimately, the goal is for SAFER grantees to enhance their ability to attain 24-hour staffing and thus assuring their communities have adequate protection from fire and fire-related hazards.

The "Grantee Responsibilities" include: "Grantees, to the extent possible, will seek, recruit, and appoint members of racial and ethnic minority groups and women to increase their ranks within the applicant's department."

The 2005 hiring process resulted in the certification of 48 candidates on the eligibility list.[2] The list included three protected-group candidates: Torgerson,

---

[2]The record does not indicate why 48, rather than 50, candidates were on the eligibility list.

Mundell, and another female not a party to this appeal. Torgerson is a member of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin. At the time of his application, he was a volunteer firefighter in Wisconsin. Torgerson had completed three years of college toward a degree in fire protection, including completion of Firefighter I and Fire Inspector I courses, for which he held certifications. He was certified as an "EMT-Basic" by the National Registry of Emergency Medical Technicians (NREMT) and the Minnesota Emergency Medical Services Regulatory Board. Mundell, at the time of her application, had several part-time jobs, including serving as a "public education assistant" for the City presenting fire-safety programs to second- and fourth-graders in Rochester (she was hired for the hourly position after e-mailing the Fire Chief inquiring about a volunteer position). She had an associate degree in business management and a diploma in intensive care paramedics from a local community college. She held a NREMT certificate, her EMT-Basic license, and licenses for completing the Firefighter I and Firefighter II courses.

Based on the written and physical-agility phases of the process (Phases I and II) *and* veterans' points, Torgerson ranked 45th, and Mundell 46th, of 48 candidates. Both advanced to the panel interview, Phase III. Mundell was interviewed by Battalion Chief Charles A. Hermann, Olmsted County HR Risk Management Analyst Joan Till-Born, and Commissioner Joseph R. Powers. Torgerson was interviewed by Hermann, Till-Born, and Commissioner John Withers. Torgerson and Mundell agree that the questions asked were what they anticipated based on the list of possible questions, and that none of the questions were inappropriate. Mundell and Torgerson ranked 37th and 41st, respectively, on the panel interview, Phase III. This scoring– combined with their scores from Phases I and II and the veterans' points awarded to others–placed Mundell 40th on the final eligibility list and Torgerson 45th.[3] The Commission unanimously certified the eligibility list of 48 candidates at its meeting on November 22. Of the top eight candidates on the eligibility list, seven received

---

[3]The other female candidate ranked 37th.

veterans' points, including the top six–a substantial impact on rankings among the top candidates.

On December 15, Fire Chief David A. Kapler requested that the Commission forward candidates from the eligibility list to fill six vacancies. On January 9, 2006, he requested another candidate (to replace a terminated firefighter)–bringing the total vacancies to seven.

At a January 18 meeting, the Commission discussed the purpose of the SAFER grant and whether the Commission should expand the certification to include protected-group candidates. At the meeting, the City's HR Director Linda Gilsrud noted the "minimal differences in the total points between candidates" on the eligibility list.[4] Gilsrud explained the SAFER grant, stating that its purpose is to "ensure qualified protected class applicants are considered for employment opportunities within the City." She told the Commission it has a "unique opportunity to consider protected class candidates" for the seven firefighter positions. Attending the meeting, the Mayor agreed and "strongly encouraged" the Commission to "seriously consider" the protected-group candidates "while working within the established procedures." Commissioner Powers said that although all candidates on the eligibility list are qualified, the rank order should be carefully considered. Commissioner Powers added that he had the opportunity on the interview panel to "interview one of the protected class candidates [Mundell]" and believed "we would not be doing justice by recommending their appointment to the position at this time" because he "would not want to recommend candidates who would not be successful." Commissioner Field noted the "limited number of protected class candidates" participating in the Firefighter curriculum, and "suggested the City consider allotting the financial resources for allowing protected class candidates educational opportunities."

---

[4]Although a total of ten points separated the candidates ranked 1st through 25th, Torgerson and Mundell were not ranked in the top 25 candidates at any time.

After this discussion, the Commission unanimously agreed to certify to the City Council the rule-of-three candidates in rank order for six appointments, and for the seventh appointment, the rule-of-three candidates plus an expanded certification of three protected-group candidates. As a result, the top nine candidates, plus the three protected-group candidates, faced the final stage: an in-depth background investigation, medical and psychological examinations, and an interview with the Fire Chief. Torgerson and Mundell thus advanced to the final stage for the seventh position, while retaining their 45th and 40th rankings, respectively. Because all three protected-group applicants were certified for one position (the seventh), at most one of them could be hired.

Fire Chief Kapler, with the assistance of the deputy Fire Chief, interviewed the candidates ranked 1 through 9–all males–and the three protected-group candidates. When interviewing the top-ranked candidates, Kapler looked for a "red flag. Something that shows up. It could be a gut-level feeling . . . that might give us a clue that there is a concern about a candidate." When interviewing the protected-group candidates, Kapler looked for "something that might have been missed. Is there some quality or attribute this person brings that didn't come out in the test that we can say, wow, this is a strong candidate regardless of their test scores." Kapler initially decided not to recommend Candidate 3 because he did not "possess National EMT Registration," and Candidate 4 because he did not show up for his interview or update his contact information.

Kapler then requested four additional candidates–candidates ranked 10 through 13–whom he interviewed. In a February 13 memorandum, Kapler made his recommendations to the Commission. In addition to not recommending Candidates 3 and 4, Kapler stated that he also did not recommend Candidate 10 because he "was not eligible for EMT National Registry before the [eligibility] list was certified" and Candidate 11 because he did "not demonstrate the level of maturity and preparedness to be successful."

Kapler's memorandum said he did not recommend the three protected-group candidates because they had not "demonstrated themselves to be equally or better qualified" than the individuals recommended . According to Kapler's notes from the interview, he found that Torgerson had "awkward communication," came across as "unsophisticated," had "difficulty communicating," "lacked the characteristics other applicants possessed," and did not demonstrate anything to make himself more qualified than what his score already indicated. Kapler did not recommend Mundell because during the interview she did not demonstrate that she was equally or better qualified than the candidates at the top of the eligibility list, or show that she was "better qualified than her test scores may have indicated." At his deposition, Kapler acknowledged that his February 13 memorandum did not give a particular reason, or an objective reason, for not recommending them.

The deputy Fire Chief's notes from the interview indicate that Mundell was not "a standout." The deputy Fire Chief's notes on Torgerson say he was a "talker," "nice," "odd," and a "BSer" (which the deputy testified meant "I couldn't believe everything he said"). The deputy Fire Chief concluded that Torgerson also was not a "standout."

The Commission, with all three commissioners present, discussed Kapler's recommendations on February 27. Also on that date, Kapler withdrew his recommendations for two more candidates–Candidate 2 because Kapler did not expect the results of his medical examination in time for hiring, and Candidate 5 because he did not have his NREMT certification on the date the eligibility list was certified. In sum, of the top 13 ranked candidates, Kapler did not recommend six, leaving only seven recommended candidates (at least nine are needed for the "rule of three"). Kapler requested four more candidates to interview, but the Commission tabled the matter.

At the end of the February 27 meeting of the Commission, during "other business," two of the candidates that Kapler did not recommend for lacking NREMT certification questioned the meaning of "Current NREMT certification OR registry

eligible," which had appeared in the written information from the Commission and on the website. After discussing the conflicting information given the candidates, the Commission tabled the issue, requested clarification from the Fire department, and then voted unanimously to permit candidates 3, 5, and 10 (collectively, "registry-eligible candidates") to continue in the selection process. According to the City's HR director, the City decided that the registry-eligible candidates were qualified because it determined there was an "ambiguity or conflict in information provided to the candidates" about the meaning of "registry eligible."

On March 15, Kapler recommended Candidates 1 through 3, and 5 through 10, to satisfy the rule of three for seven positions.[5] Kapler testified he changed his recommendation on the registry-eligible candidates because "once [the Commission] ruled that in their opinion that these candidates did meet the intent of the stated requirements, . . . these candidates were now qualified." Kapler did not mention the protected-group candidates or Candidates 11 through 13 in his March 15 memorandum. At a Commission meeting that same day, Commissioners Withers and Powers voted to present to the City Council the candidates as finally recommended by Fire Chief Kapler. Commissioner Roger Field was not present at the meeting.

Without discussion, following the rule of three, the City Council appointed Candidates 1 through 3, and 5 through 8 as firefighters on March 20, 2006. Shortly after the Council's appointments, the media reported that Candidate 3 had been convicted of vehicular homicide eight years before.[6] An emergency Council meeting

---

[5]The record does not indicate why Kapler changed his recommendation on Candidate 2 (the one pending results of medical evaluation). Appellants do not challenge the change.

[6]The Commission's Rules grant it discretion to remove an applicant from the eligibility list if "the applicant has been guilty of a crime," or to remove an officer for "commission of a felony." The City's HR director testified to the policy of Minnesota Statute § 364.03, the Criminal Rehabilitation Act: that public employers may not disqualify job applicants based on a conviction, unless it directly relates to

-10-

was called on March 29 to decide whether to reconsider the appointments. Immediately before the meeting, Council Member Carr had a conversation with Commissioner Withers who allegedly told Carr that the Commission wanted to hire Candidate 3 (the convicted felon) because "he was the absolute big, strong firefighter type," or "he was a big guy and that he'd make a good firefighter."[7] At the meeting, Carr tried to discuss whether the City had complied with the SAFER grant. The city attorney advised the Council that compliance with the SAFER grant was not a topic for the emergency meeting. The Council did not discuss the SAFER grant. On the recommendation of the City Administrator, the Council voted not to reconsider the seven appointments, resulting in the hiring of Candidates 1 through 3, and 5 through 8.

In response to calls about the appointments, Council Member Carr investigated the City's hiring process. During the course of his investigation, Carr came to believe that the SAFER grant *required* the City to seek, recruit, and appoint women and minorities, although he understood that the Commission and city attorney disagreed with him. At a council meeting about three months after the hirings, Carr questioned Fire Chief Kapler about the hirings, the SAFER grant, and the protected-group candidates Torgerson and Mundell. Carr testified that Kapler said, "I interviewed them and . . . I found them unfit."

Carr further testified that about a year after the emergency meeting, he called Commissioner Field:

_____

the position sought.

[7]The panel opinions have a slightly different statement, which merges the actual quotations. ***Torgerson v. City of Rochester***, 605 F.3d at 592, 603. The first quotation above is Carr's initial answer, and the second quotation is his answer to "what words Mr. Withers said."

I said–the first question I asked [Field] was are you aware of all of the terms and conditions of the SAFER grant. And then he said, what do you mean? And I said, well, they stipulated you hire women and minorities. And he said I knew nothing of that. He said had I known, I would have recommended that the City not take the grant. He said the City should never have taken the grant if that was the stipulation.

Torgerson and Mundell filed discrimination charges with the Minnesota Department of Human Rights and the Equal Employment Opportunity Commission. The MDHR found that the evidence did not substantiate Torgerson and Mundell's allegations, and dismissed the charges. The EEOC adopted the MDHR's findings, and also dismissed the charges. Torgerson and Mundell then sued in district court, asserting disparate-treatment claims of national-origin discrimination, and sex discrimination, respectively. The City moved for summary judgment, which the district court granted.

## II.

### A.

This court reviews de novo a grant of summary judgment. *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 450 F.3d 338, 342 (8th Cir. 2006). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." **Fed. R. Civ. P. 56(c)(2)**. The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." *Id.* at 324, *quoting* **Fed. R. Civ. P. 56(e)(2)**. "On a motion

for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" ***Ricci v. DeStefano***, 129 S. Ct. 2658, 2677 (2009) *quoting **Scott v. Harris***, 550 U.S. 372, 380 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." ***Reeves* v. *Sanderson Plumbing Prods., Inc.***, 530 U.S. 133, 150 (2000), *quoting **Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 255 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." ***Matsushita Elec. Indus. Co. v. Zenith Radio Corp.***, 475 U. S. 574, 586-87 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" ***Ricci,*** 129 S. Ct. at 2677, *quoting **Matsushita***, 475 U.S. at 587.

Torgerson and Mundell devote one-fourth of their written argument to the standard of review. They emphasize statements in panel opinions that in employment discrimination cases, summary judgment should "seldom" or "sparingly" be granted, not in "very close" cases, only "with caution," or after being "particularly deferential" to the nonmovant–although noting that these statements often appear near contradictory statements, and the panels frequently affirm summary judgments. *See* cases listed in the appendix to this opinion. Compiling the percentage of cases where the district judge here (and other judges in the district) grant summary judgment in employment discrimination cases, Torgerson and Mundell request reversal based on a separate standard for these cases.

The panel statements asserting a different standard of review for summary judgment in employment discrimination cases are contrary to Supreme Court precedent. The Court has reiterated that district courts should not "treat discrimination differently from other ultimate questions of fact." ***Reeves***, 530 U.S. at 148, *quoting **St. Mary's Honor Ctr. v. Hicks***, 509 U.S. 502, 524 (1993), *quoting **USPS Bd. of Governors v. Aikens***, 460 U.S. 711, 716 (1983). In a landmark case, the Court wrote:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action."

*Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). Because summary judgment is not disfavored and is designed for "every action," panel statements to the contrary are unauthorized and should not be followed. There is no "discrimination case exception" to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial. *Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010), *citing Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir. 2006), *and quoting Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir. 1999).

B.

Torgerson and Mundell make disparate-treatment claims under Title VII and the MHRA, alleging discrimination based on Torgerson's national origin and Mundell's sex. Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire . . . any individual . . . because of such individual's . . . sex . . . or national origin." **42 U.S.C. § 2000e-2(a)(1)**. The MHRA states that "it is an unfair employment practice for an employer, because of . . . national origin [or] sex . . . to . . . refuse to hire" or "discriminate against a person with respect to hiring . . . ." **Minn. Stat. § 363A.08, subd. 2**. The same analysis applies to both MHRA and Title VII claims. *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005); *Bahr v. Capella Univ.*, 788 N.W.2d 76, 83 (Minn. 2010).

Both sides organize their argument in terms of the framework in *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). Torgerson and Mundell quote almost all of the following passage from the *Griffith* case:

-14-

We have long recognized and followed this principle in applying *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792, 802–03 (1973)] by holding that a plaintiff may survive the defendant's motion for summary judgment in one of two ways. The first is by proof of "direct evidence" of discrimination. Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997). Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial. But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext. *See, e.g., Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 971 (8th Cir. 1994).

## C.

Torgerson and Mundell claim that two Commissioners made statements that are direct evidence of discrimination.

## 1.

Council Member Carr testified that he called Commissioner Roger Field about a year after the hirings:

I said–the first question I asked [Field] was are you aware of all the terms and conditions of the SAFER grant. And then he said what do you

-15-

mean? And I said, well, they stipulated you hire women and minorities. And he said I knew nothing of that. He said had I known, I would have recommended that the City not take the grant. He said the City should never have taken the grant if that was the stipulation.

First, it is doubtful that Commissioner Field was a decisionmaker in the hirings themselves. *See Elam v. Regions Fin. Corp.*, 601 F.3d 873, 878 (8th Cir. 2010) ("statements by nondecisionmakers" are not direct evidence). He was absent when the two other commissioners voted to send to the Council the candidates hired; did not interview Torgerson or Mundell; did not sign five of the "recommendation" forms (including Torgerson's and Mundell's); and according to Council Member Carr, was "out of town during all of this" conclusion of the hiring process. *See McKay v. U. S. Dep't of Transp.*, 340 F.3d 695, 699 (8th Cir. 2003) (Federal office manager who was not selecting official, or even on interview panel, was not a "decisionmaker," so any ageist comments were stray remarks and not direct evidence). There is no evidence Commissioner Field influenced the ultimate decisionmaker, the City Council, or that it deferred to him in its hiring decision. *See Arraleh v. County of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006) (remarks by county employee with no hiring authority were not direct evidence because record had no evidence the employee influenced the hiring decisionmaker); *cf. Mohr v. Dustrol, Inc.*, 306 F.3d 636, 641 (8th Cir. 2002), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 95 (2003) (comments by supervisor not "officially responsible" for hiring were direct evidence where supervisor played a "pivotal role" in hiring and officials deferred to his hiring decision). However, Commissioner Field did vote to certify the ranked eligibility list, signed 10 (of 15) recommendation forms, participated in Commission meetings during the process, and many acts were done in the name of all three Commissioners, including him. *See Mohr*, 306 F.3d at 641 (statements by those "closely involved" in hiring decision may be direct evidence); *EEOC v. Liberal R-II Sch. Dist.*, 314 F.3d 920, 924 (8th Cir. 2002) (discussing cases with statements by "closely involved" non-decisionmakers). *See generally Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011)

-16-

(if a non-decisionmaker performs an act motivated by a discriminatory bias that is intended to cause, and that does proximately cause, an adverse employment action, then the employer has cat's-paw liability).

Second, assuming Commissioner Field was a decisionmaker, Torgerson and Mundell seek to extrapolate gender and national-origin animus from a statement opposing mandatory hiring of women and minorities. Commissioner Field's opinion cannot demonstrate a discriminatory animus because Congress explicitly commands that Title VII shall not be interpreted to require preferential treatment because of sex or national origin on account of an imbalance in the number or percent of those employed, compared to the relevant number or percent in the community. *See* **42 U.S.C. 2000e-2(j)**. *See also* ***Ricci***, 129 S. Ct. at 2675 (disapproving "a *de facto* quota system" and the discarding of firefighter test results with the intent of obtaining the employer's preferred racial balance, because the purpose of Title VII "is to promote hiring on the basis of job qualifications, rather than on the basis of race or color" (quoting ***Griggs v. Duke Power Co.***, 401 U.S. 424, 434 (1971))). As the Supreme Court put it:

> Title VII prohibits all discrimination in employment based upon race, sex, and national origin. "The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and . . . neutral employment and personnel decisions." *McDonnell Douglas, supra*, at 801. Title VII, however, does not demand that an employer give preferential treatment to minorities or women. 42 U.S.C. § 2000e-2(j). *See Steelworkers v. Weber*, 443 U.S. 193, 205-06 (1979). The statute was not intended to "diminish traditional management prerogatives." *Id.*, at 207. It does not require the employer to restructure his employment practices to maximize the number of minorities and women hired. *Furnco Construction Corp v. Waters*, 438 U.S. 567, 577-78 (1978).

***Texas Dep't of Cmty. Affairs v. Burdine***, 450 U.S. 248, 259 (1981). Commissioner Field's statement is not direct evidence of discrimination.

-17-

2.

Torgerson and Mundell cite the testimony of Council Member Carr that just before the emergency meeting called to reconsider the hiring of a convicted felon, Commissioner John Withers told Carr he had recommended the convicted felon for a firefighting position because "he was a big guy and that he'd make a good firefighter."

This comment is facially and contextually neutral as to national origin. Direct evidence does not include statements by decisionmakers that are facially and contextually neutral. *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006).

A remark by a decisionmaker, in order to be direct evidence of sex discrimination, must show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action. *See McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860-61 (8th Cir. 2009); *cf. Simmons v. New Pub. Sch. Dist. No. Eight*, 251 F.3d 1210, 1213, 1214 (8th Cir. 2001) (school board president's statements that "a woman can't handle [the administrator's] job" and that the employee was "a woman in a man's job" are direct evidence of sex discrimination); *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1318, 1324 (8th Cir. 1994) (supervisor's comment that "women in sales were the worst thing" to happen to the company is direct evidence of sex discrimination).

As Carr says, the "big guy" statement came in the context of a conversation about a specific candidate just before an emergency Council meeting that focused on reconsidering his appointment. The "big guy" statement does not relate to Mundell, or to the abilities of female applicants, and thus is not direct evidence of discrimination. *See Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1017-18 (8th

Cir. 1999) (statements that do not relate to the plaintiff herself, or to the abilities of female employees, are not direct evidence of gender discrimination); *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238-39 (6th Cir. 2005) (post-selection statement, in response to inquiry, that the hiring committee wanted a "grass roots guy" and that the selectee interviewed well *held* not direct evidence of gender discrimination as it was isolated, ambiguous, fairly innocuous, and a description of the selectee).

Torgerson and Mundell do not present direct evidence of gender or national-origin discrimination against them in violation of Title VII.

D.

Under the *McDonnell Douglas* framework, Torgerson and Mundell must first establish a prima facie case of discrimination. 411 U.S. at 802. In a hiring context, an applicant must show:

> (1) she is in a protected class; (2) she was qualified for an open position; (3) she was denied that position; and (4) the [employer] filled the position with a person not in the same protected class.

*Dixon v. Pulaski County Special Sch. Dist.*, 578 F.3d 862, 867-68 (8th Cir. 2009). The burden of production then shifts to the City to "articulate a legitimate, non-discriminatory reason for not hiring" them. *Id.* at 868. "[T]he ultimate burden [then] falls on [Torgerson and Mundell] to produce evidence sufficient to create a genuine issue of material fact regarding whether [the City's] proffered nondiscriminatory justifications are mere pretext for intentional discrimination." *See Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005). Torgerson and Mundell's burden to show pretext "merges with the ultimate burden of persuading the court that [they were] the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. Proof of pretext, coupled with a strong prima facie case, may suffice to create a triable question

of fact. *Wallace*, 442 F.3d at 1120 n.2, *citing **Reeves***, 530 U.S. at 148. Torgerson and Mundell retain, at all times, the ultimate burden of proof and persuasion that the City discriminated against them. *Id.* at 1119.

E.

The City argues that Torgerson and Mundell did not establish a prima facie case because they were not the best qualified for the firefighter positions. The City emphasizes that they ranked lower on the eligibility list due to their substantially lower scores in all phases of the hiring process. This circuit, however, has squarely rejected the proposition that a plaintiff must prove her *relative* qualifications to meet her prima facie burden. *Dixon*, 578 F.3d at 868, *citing **Turner v. Honeywell Fed. Mfg. & Techs., L.L.C.***, 336 F.3d 716, 721-22 (8th Cir. 2003), *citing **Hawkins v. Anheuser-Busch, Inc.***, 697 F.2d 810, 813-14 (8th Cir. 1983). *See **Hase v. Missouri Div. of Employment Sec.***, 972 F.2d 893, 896 n.1 (8th Cir. 1992) (where state agency was considering the top ten candidates on a list from the personnel department, plaintiff's inclusion on list showed qualifications sufficient to establish a prima facie case). "The burden of establishing a prima facie case of disparate treatment is not onerous." ***Burdine***, 450 U.S. at 253. It is undisputed that Torgerson and Mundell, by making the eligibility list, were qualified for the firefighter positions, which were filled by non-Native American males. They have established a prima facie case.

The burden then shifts to the City. "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." ***Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs.***, 188 F.3d 932, 936 (8th Cir. 1999). The City met this burden with its consistently stated reason for not hiring Torgerson and Mundell:

> [T]he City did not hire Appellants because both scored significantly lower than other candidates. It also did not hire Appellants because their

interviews with Chief Kapler only confirmed what the testing phase had shown: both Appellants were lacking in qualifications as compared to the higher ranking candidates.

Torgerson and Mundell believe that the City's stated reason for not hiring them is pretext for discrimination. There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext. *Wallace*, 442 F.3d at 1120. A plaintiff may show that the employer's explanation is "unworthy of credence . . . because it has no basis in fact." *Id.* Alternatively, a plaintiff may show pretext "by persuading the court that a [prohibited] reason more likely motivated the employer." *Id.* Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action. *Id.*

Torgerson and Mundell believe several instances show that the City's stated reason was a pretext for discrimination: (1) their qualifications compared to the hired candidates; (2) the subjective nature of part of the hiring process, specifically the panel and Fire Chief interviews; (3) the different standards Kapler used in the Fire Chief interviews; (4) Kapler's reference to Torgerson and Mundell as "unfit"; and (5) the hiring of an additional five males a year after the challenged 2005-2006 hirings. Categories (1) and (2) appear to be attempts to show that the City's stated reason has no basis in fact, while categories (3), (4), and (5) appear to be attempts at demonstrating an actual discriminatory motivation.

1.

Torgerson and Mundell–who have the burden–assert repeatedly that they are "objectively better qualified" than the hired candidates. This assertion is refuted by their own admissions. At their depositions, both Torgerson and Mundell stated that they were not challenging "anything" about the written examination (Phase I) or the physical-agility test (Phase II). At no time have Torgerson and Mundell challenged the award of veterans' points. *See* **42 U.S.C. § 2000e-11** ("Nothing contained in [Title VII] shall be construed to repeal or modify any federal, state, territorial, or local law creating special rights or preference for veterans.") Setting aside the oral interview–and basing the rankings on the undisputed scores in the rest of the process–Torgerson ranks 45th, and Mundell 46th, of 48 candidates.[8] As clear from Table 1, no reasonable jury could find that Torgerson and Mundell were better qualified than the hired candidates.

---

[8]The panel opinions are inaccurate because the rankings discussed there–Torgerson 41st and Mundell 46th–are the rankings only for Phase II. *Compare* ***Torgerson v. City of Rochester***, 605 F.3d at 590, 602 n.11, *with* Appellants' appendix 17, 94, 209. Based on their undisputed scores, set out in Table 1, Torgerson and Mundell do not rank anywhere near the hired applicants (and especially the veteran candidates, including candidates 6 and 8). *Compare* 605 F.3d at 596, 602 n.11.

**TABLE 1**

| Candidate | Undisputed Eligibility Points -Phase I written exam -Phase II physical agility -Veterans' points | Undisputed Rank -Phase I written exam -Phase II physical agility -Veterans' points | Final Eligibility Points | Final Rank |
|---|---|---|---|---|
| 1 | 60.95 | 2 | 91.826 | 1 |
| 2 | 61.60 | 1 | 90.984 | 2 |
| 3 | 59.15 | 3 | 90.310 | 3 |
| 4 | 56.00 | 5 | 90.064 | 4 |
| 5 | 56.45 | 4 | 88.930 | 5 |
| 6 | 55.85 | 7(tie) | 88.066 | 6 |
| 7 | 54.75 | 13 | 88.022 | 7 |
| 8 | 55.55 | 9(tie) | 87.766 | 8 |
| – | – | – | – | – |
| – | – | – | – | – |
| – | – | – | – | – |
| – | – | – | – | – |
| 40 **Mundell** | 50.25 | 46 | 76.658 | 40 |
| 45 **Torgerson** | 50.85 | 45 | 73.826 | 45 |

To get the undisputed points and rank,
*subtract* oral eligibility points *from* final
eligibility points (Appellants' appendix 209).

Final Eligibility Points
− Oral Eligibility Points (Phase III)
Undisputed Eligibility Points
*(Phase I, Phase II, Veterans' points)*

The City has consistently maintained that the selected candidates were more qualified than Torgerson and Mundell. "Where . . . the employer contends that the selected candidate was more qualified for the position than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision." ***Chock v. Northwest Airlines, Inc.***, 113 F.3d 861, 864 (8th Cir. 1997).

"[T]o support a finding of pretext, [the applicant] must show that the City hired a *less* qualified applicant." ***Kincaid v. City of Omaha***, 378 F.3d 799, 805 (8th Cir. 2004) (emphasis in the original). The Supreme Court has approved similar standards from other circuits. *See* ***Ash v. Tyson Foods, Inc.***, 546 U.S. 454, 457-58 (2006) (per curiam) (approving three cases: (1) ***Cooper v. Southern Co.***, 390 F.3d 695, 732 (11th Cir. 2004) ("disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question") (internal quotation marks omitted); (2) ***Raad v. Fairbanks N. Star Borough Sch. Dist.***, 323 F.3d 1185, 1194 (9th Cir. 2003) (qualifications evidence standing alone may establish pretext where the plaintiff's qualifications are "clearly superior" to the selected applicants); and, (3) ***Aka v. Washington Hosp. Ctr.***, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc) (the factfinder may infer pretext if "a reasonable employer would have found the plaintiff to be significantly better qualified for the job")).

The best that Torgerson and Mundell can assert is that they have relatively similar qualifications. "If the comparison 'reveals that the plaintiff was only similarly qualified or not as qualified as the selected candidate,' then no inference of . . . discrimination would arise." ***Wingate v. Gage County Sch. Dist.***, 528 F.3d 1074, 1080 (8th Cir. 2008), *quoting* ***Chambers v. Metro. Prop. & Cas. Ins. Co.***, 351 F.3d 848, 857 (8th Cir. 2003) "Similar qualifications" do "not raise an inference of . . . discrimination." ***Chock***, 113 F.3d at 864. *See also* ***Lidge-Myrtil v. Deere & Co.***, 49 F.3d 1308, 1311 (8th Cir. 1995) ("Although [an employee] does possess the experience and some of the other qualities essential for success in the position, this does not suffice to raise an inference that [the employer's] stated rationale for giving the position to another is pretextual"); ***Pierce v. Marsh***, 859 F.2d 601, 604 (8th Cir. 1988) ("The mere existence of comparable qualifications between two applicants . . . alone does not raise an inference of . . . discrimination.").

Here, Torgerson and Mundell appeared on the eligibility list, ranked far below the hired candidates. At best, they have "relatively similar qualifications" to some hired candidates. As clear from the cases, "relatively similar qualifications" do not create a material issue of fact as to pretext.

2.

Torgerson and Mundell attack the interviews–by the Phase III three-person panel and by the Fire Chief–as so subjective as to show that the City's ranking of candidates has no basis in fact.[9]

Employers are entitled to compare applicants' performance during interviews. *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 989 (8th Cir. 2011). Where the employer does not rely exclusively on subjective criteria, but also on objective criteria and education, the use of subjective considerations does not give rise to an inference of discrimination. *Wingate*, 528 F.3d at 1080. If employees are evaluated on an objective performance scale by a uniformly applied process, the subjectivity of some components cannot in and of itself prove pretext or discriminatory intent. *Elliott v. Montgomery Ward & Co.*, 967 F.2d 1258, 1262-63 (8th Cir. 1992). Viewing the evidence favorably to Torgerson and Mundell, this court asks if they have identified a genuine issue of material fact whether the degree of subjectivity renders the City's stated reason to be pretextual.

---

[9]Mundell probably waived any attack on the Phase III three-person interview. Asked (at her deposition) "Was there–is there anything about the oral interview process that you are challenging as part of your lawsuit?" Mundell flatly answered, "No." While she ranked 46th of 48 on the other (undisputed nondiscriminatory) parts of the process, she ranked 37th on the panel interview, making her final ranking 40th.

Torgerson and Mundell emphasize the significance of the panel interviews as 40 percent of their scores, and the wide range of interview scores among candidates. They stress that the Fire Chief interview is essentially pass/fail. They fail, however, to identify any evidence that the interviews were discriminatory. The Phase III interviews were conducted as a uniformly applied process using an objective performance scale and objective criteria. Each panel consisted of an HR interviewer, a Commissioner, and a Fire department representative. The interviewers received a list of HR-prepared questions. A private HR firm instructed them how to ask and score the responses by objective criteria. Each applicant was asked the same questions in the same order by the same interviewer. The applicants received, in advance, the list of ten potential questions, and a written memo from the HR firm identifying the qualities at issue. Even Torgerson and Mundell agree that the questions asked were what they anticipated based on the list of possible questions, and that none of the questions were inappropriate.

Due to expanded certification, both Torgerson and Mundell advanced to the Fire Chief interview. The Fire Chief's notes from the interview demonstrate a basis in fact for the City's stated reason not to hire them. The Chief found that Torgerson had "awkward communication," came across as "unsophisticated," had "difficulty communicating," "lacked the characteristics other applicants possessed," and did not demonstrate anything to make himself more qualified than what his score already indicated. (The deputy Chief's notes also record that Torgerson interviewed poorly.) The Fire Chief did not recommend Mundell because during the interview she did not demonstrate that she was equally or better qualified than the candidates at the top of the eligibility list, or show that she was "better qualified than her test scores may have indicated." (Commissioner Powers's assessment of Mundell's panel interview, recorded in the Commission's minutes, matches the Fire Chief's conclusions.) The interviewers here were "able to explain, in clear and reasonably specific terms, their reasons for scoring [Torgerson and Mundell] lower than the [hired] candidates." *See Brooks v. Ameren UE*, 345 F.3d 986, 988 (8th Cir. 2003).

Torgerson and Mundell identify no evidence that discrimination took place. Their own opinions that they should have received higher interview scores are "simply irrelevant" as it is the employer's perception that is relevant, not the applicants' "subjective evaluation" of their own "relative performance." *Id.* In fact, they assert only that there was "potential" for discrimination in the interviews. "[T]he presence of subjectivity in employee evaluations is *itself* not a grounds for challenging those evaluations as discriminatory." ***Wittenburg v. Am. Express Fin. Advisors, Inc.***, 464 F.3d 831, 839 (8th Cir 2006). To defeat summary judgment, Torgerson and Mundell must produce sufficient evidence from which a reasonable factfinder could infer discrimination. *See **Burkhart v. Am. Railcar Indus., Inc.***, 603 F.3d 472, 473-74 (8th Cir. 2010); ***Pierce***, 859 F.2d at 603-04 (In civil-service hiring from ranked qualified candidates on a list based on a combination of factors: "Even if these subjective reasons ["evaluation based on personal observation of the candidates"] could be rejected on credibility grounds, such a rejection of that evidence would not add anything to the lack of a showing of pretext by [the applicant]."). Here, that some of the hiring process was more subjective does not add anything to the lack of showing of pretext by Torgerson and Mundell. *See **McCullough v. Real Foods, Inc.***, 140 F.3d 1123, 1129 (8th Cir. 1998) (requiring both an "extremely subjective" employer's process *and* "a substantially better qualified" applicant in order to reverse summary judgment). In this case, a reasonable jury could not infer pretext from the *absence* of evidence. *Compare **Gentry v. Georgia-Pacific Corp.***, 250 F.3d 646, 651 (8th Cir. 2001) ("In light of the limited nature of the interview questioning and the multi-component selection process ["of which the interview was only one part"], a candidate's score in the interview portion could not reasonably be deemed conclusive of the candidate's ultimate ranking by the panel.").

Torgerson and Mundell's objections to the hiring process are unpersuasive. The City's explanation of its hiring decisions has a "basis in fact." *See **Wallace***, 442 F.3d at 1120.

-27-

3.

Torgerson and Mundell may also show pretext by "persuading the court that a [prohibited] reason more likely motivated the employer." *Id.*

Torgerson and Mundell stress the different standards Fire Chief Kapler used in the final interviews of candidates. For those at the top of the eligibility list, he looked for a "red flag," a reason not to hire them. When interviewing those at the bottom–them–he testified he looked for a reason to hire them:

> Is there something about these candidates that would elevate them to the level of being better than the candidates at the top of the list. Or at least even equal, because of our desire to attract and hire protected class.

No rational trier of fact could find this discriminated against Torgerson and Mundell. It is undisputed that at all times, they retained their ranks on the eligibility list, and by their own admissions of the undisputed ranks, those at the top were more qualified than those at the bottom. While instances of disparate treatment can support a claim of pretext, Torgerson and Mundell have the burden to prove that they and the top applicants were "similarly situated in all relevant respects"–a "rigorous" standard at the pretext stage. *See King v. Hardesty*, 517 F.3d 1049, 1063 (8th Cir. 2008). In light of the undisputed facts, no reasonable jury could find that Torgerson and Mundell were similarly situated in all relevant respects to the hired candidates. Thus, no reasonable jury could find that the different Fire-Chief-interview standards demonstrate pretext for discrimination.

4.

Council Member Carr testified that at a council meeting about three months after the challenged hirings, he questioned Fire Chief Kapler when he sought to hire more firefighters. Carr brought up the recent hirings, the SAFER grant, and the protected-group candidates Torgerson and Mundell. Carr testified:

> And he [Kapler] said I interviewed them, and these are his exact quotes, he said I found them unfit.

At his deposition, Kapler three times denied using the word "unfit," and thought he probably commented that they were not better qualified than the top candidates. Pressed by opposing counsel, Kapler said, "I don't see anything unfit about them," and "they're not unfit as people." Asked why he hesitated to say "fit" or "unfit," Kapler stated:

> Well, I guess it depends on what the word "fit" means. To us it has a specific connotation. A fitness for duty type of evaluation, mental, emotional, physical, is all part of a person's fitness for duty. So that's how I use the word fit. They are–they are on our list as qualified candidates, so yes, they're qualified to be firefighters.

For purposes of summary judgment, this Court credits Carr's testimony that three months after the hirings, Fire Chief Kapler said, "I found them unfit." *See Chism v. Curtner*, 619 F.3d 979, 982 n.2 (8th Cir. 2010). Viewed favorably to them, Torgerson and Mundell demonstrate an admission by Kapler that, to quote their brief, "they were not mentally or physically fit for duty, even though they had passed the required physical agility test and the City's background check."

Torgerson and Mundell have identified a factual dispute, but a disputed fact alone will not defeat summary judgment, rather there must be a genuine issue of material fact. *Liberty Lobby*, 477 U.S. at 247-48. To be material, a fact "must affect the outcome of the suit under the governing law." *Id*. at 248. The dispute as to what Kapler said to Carr is not material. Everyone involved in this case – Torgerson, Mundell, *and* all the City officials, except Kapler once (according to Carr) – agreed that they were qualified to be firefighters. Kapler's statement, "I found them unfit," is not material to the outcome of this case, and thus does not preclude summary judgment.

5.

Torgerson and Mundell claim that the City's hiring of five non-protected-group males in August 2007 (a year and a half after the challenged 2005-2006 hirings) is

-29-

evidence of pretext. The record has almost no evidence about the 2007 hirings, except that they were based on the same eligibility list as in 2005-2006, and that the Commission certified no protected-group applicants in 2007. Because there is no evidence that the 2007 hires were similarly situated in all relevant respects to Torgerson and Mundell, the 2007 hirings add no additional proof of discrimination in this disparate-treatment case. *See McClure v. Career Sys. Dev. Corp.*, 447 F.3d 1133, 1136 n.2 (8th Cir. 2006) (person hired over three years later, with no other facts in record, was not similarly situated in all relevant respects to the plaintiff).

6.

In terms of the framework they present, Torgerson and Mundell fail at step three of the *McDonnell Douglas* analysis: they do not identify evidence from which a reasonable trier of fact could conclude that the City's reason for not hiring them was pretextual. From any perspective, on the record as a whole, Torgerson and Mundell's disparate-treatment claims fail the essential inquiry on summary judgment: the evidence here is so one-sided that it does not present a sufficient disagreement to require submission to a jury. *See Liberty Lobby*, 477 U.S. at 251-52.

III.

Torgerson claims the City violated 42 U.S.C. § 1981 by discriminating against him "on the basis of his national origin." Section 1981 protects "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). For example, if an individual is "subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin . . . [then] he will have made out a case under § 1981." *Id.* Section 1981 does not authorize discrimination claims based on national origin. *Zar v. S.D. Bd. of Exam'rs of Psychologists*, 976 F.2d 459, 467 (8th Cir. 1992) ("This claim of discrimination based upon national origin is insufficient to state a § 1981 claim.").

Torgerson contends that his claim is based on Native American status, which may be treated as both a race claim and a national-origin claim. *See Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 154 F.3d 1117, 1119 n.4 (9th Cir. 1998) (a claim of discrimination based on Native-American status may be a claim based on race). But a race claim based on Native-American status must be stated as a race claim, which Torgerson failed to do. Torgerson's complaint states, "Defendant has discriminated [ ] against Plaintiff in the formation of an employment contract *on the basis of his national origin*, in violation of 42 U.S.C. §1981." (Emphasis added). At no time did he move to amend his complaint to include race discrimination. Torgerson testified in a deposition that he believes he was discriminated against because of his national origin, and until the City's motion for summary judgment, never referred to race in any court documents. Because Torgerson alleges he was discriminated against based on national origin, not race, his § 1981 claim fails.

* * * * * * *

The judgment of the district court is affirmed.

COLLOTON, Circuit Judge, concurring.

I concur in the opinion of the court on the understanding that the opinion merely takes as a given the circuit precedent of *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004), and the analytical framework described therein, because the plaintiffs urge this court to apply it, and their claims fail under that framework. *Ante*, at 15-16. Whether the en banc court should adhere to *Griffith* and its inquiry into whether a plaintiff has presented "direct evidence" of discrimination in Title VII summary-judgment cases after the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), is not presented for decision. Nor does this case require us to address confusion that has arisen from efforts to apply a "direct evidence" standard. *Compare, e.g.*, *Griffith*, 387 F.3d at 736 (explaining that "circumstantial evidence" may constitute "direct evidence") *and Bakhtiari v. Lutz*, 507 F.3d 1132,

-31-

1135-36 & n.3 (8th Cir. 2007) (opinion of Beam, J.) (applying *Griffith*'s analysis that "evidence, direct or circumstantial" may constitute "direct evidence" of discrimination, while characterizing *Griffith*'s definition of "direct evidence" as "possibly one unique to this circuit") *with id.* at 1138-39 (opinion of Shepherd, J., joined by Murphy, J.) (disagreeing that "circumstantial evidence" is part of the "direct evidence" analysis under *Griffith*). *See generally Desert Palace*, 539 U.S. at 99 (explaining that Title VII requires a plaintiff to prove his case "using direct or circumstantial evidence") (internal quotation omitted); *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2357 n.7 (2009) (Stevens, J., dissenting) ("While Justice O'Connor did not define precisely what she meant by 'direct evidence,' we contrasted such evidence with circumstantial evidence in [*Desert Palace*]."); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 122 (1985) ("The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.").

Given that the summary-judgment record in this case was fully developed in the district court, moreover, it is unnecessary to consider whether the plaintiffs met a "direct evidence" standard or whether they satisfied each step of the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). This court need only decide whether, on the record as a whole, there is a genuine issue for trial on the ultimate question of discrimination *vel non*. *Riser v. Target Corp.*, 458 F.3d 817, 820-21 (8th Cir. 2006); *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005); *George v. Leavitt*, 407 F.3d 405, 411-12 (D.C. Cir. 2005); *see U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). For the reasons stated in the opinion of the court, I agree that the plaintiffs have not presented sufficient evidence from which a reasonable jury could find unlawful discrimination.

SMITH, Circuit Judge, with whom MURPHY, BYE, MELLOY and SHEPHERD, Circuit Judges, join, concurring in part and dissenting in part.

I concur in the court's holdings that (1) "[t]here is no 'discrimination case exception' to the application of summary judgment," *supra* Part II.A., and (2) Torgerson's § 1981 claim fails, *supra* Part III. I respectfully dissent from the court's conclusion that no genuine issues of material fact exist as to whether the City discriminated against Torgerson based on his national origin and Mundell based on her sex. These claims, to be sure, are not certain winners with overwhelming supporting evidence, but they need not be to merit trial by jury.

Our circuit has maintained cautionary language for handling discrimination cases for a generation. This language probably should not have survived the mid-eighties as there is no "discrimination case exception" to the summary judgment standard for employment discrimination cases, *see supra* Part II.A. It is fitting that the language of our cases match the law. That said, we should *never* forget that,

> [a]t the summary judgment stage, the court should *not weigh the evidence*, *make credibility determinations, or attempt to determine the truth of the matter*. [*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)]. Rather, the court's function is to determine whether a dispute about a material fact is genuine, that is, whether a reasonable jury could return a verdict for the nonmoving party based on the evidence. *Id.* at 248, 106 S. Ct. at 2510. The evidence of the non-movant is to be believed, and *all justifiable inferences* are to be drawn in [Torgerson and Mundell's] favor. *Id.* at 255, 106 S. Ct. at 2513. "*If reasonable minds could differ* as to the import of the evidence," *summary judgment is inappropriate*. *Id.* at 250, 106 S. Ct. at 2511.

*Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996) (emphasis added).

And, we should remain mindful that "[t]he shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the 'plaintiff [has] his day in court

despite the unavailability of direct evidence.'" *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979)). "The framework set forth in *McDonnell Douglas . . .* was 'never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Weldon v. Kraft*, 896 F.2d 793, 798 (3d Cir. 1990) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). Our sister circuits have "highlighted" the "point" that "'[t]he strength of the prima facie case and the significance of the disbelieved pretext will vary from case to case depending on the circumstances. In short, everything depends on the individual facts.'" *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 57 (1st Cir. 1999) (quoting *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 260 n. 3 (1st Cir. 1994)).

> "The sufficiency of the finding of pretext to support a finding of discrimination depends on the circumstances of the case." *Fisher v. Vassar College*, 114 F.3d 1332, 1338 (2d Cir. 1997). Moreover, "it is difficult, if not impossible, to say in any concise or generic way under what precise circumstances . . . an inference [of discrimination from a showing of pretext] will be inappropriate." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998). Because discrimination, and discrimination cases, come in many different forms, a case-by-case analysis is always necessary.

*Id.* at 57–58. A court should not become so "overly enthralled with the *McDonnell-Douglas* proof scheme" as to "lose sight of the [proverbial] forest for the trees." *Blankenship v. Warren Cnty. Sheriff's Dep't*, 939 F. Supp. 451, 460 (W.D. Va. 1996).

"[T]he third stage of the *McDonnell Douglas* framework—the pretext stage—[is perhaps] the most critical." The Honorable Timothy M. Tymokovich, United States Circuit Judge for the Tenth Circuit, *The Problem with Pretext*, 85 Denv. U. L. Rev. 503, 506–07 (2008). The Supreme Court's

description of this step . . . is similar to a description of the analysis a court would undertake in evaluating the sufficiency of the evidence in a non-Title VII case: The plaintiff "may succeed in [proving discrimination] either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."

*Id*. at 507 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). The plaintiff's burden at this stage should be no greater than the summary judgment standard requires, i.e, showing that genuine issues of material fact remain that are worthy of the truth-finding machinery of a civil trial by jury.

The court concludes that although Torgerson and Mundell established a prima face case of discrimination, *see supra* Part II.E., they failed to satisfy the third step of the *McDonnell Douglas* test, i.e., they failed to set forth sufficient evidence to create genuine issues of material fact as to whether the City's proffered nondiscriminatory justification for not hiring them—that they "scored significantly lower than other candidates" and "were lacking in qualifications as compared to the higher ranking candidates"—were pretextual, *see supra* Part II.E.1–6. In reaching this conclusion, the court, "[r]ather than concentrating on what should be the focus of attention—whether the evidence supports a finding of unlawful discrimination— . . . focus[es] on the isolated components of the *McDonnell Douglas* framework, losing sight of the ultimate issue." *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1224 (10th Cir. 2003) (Hartz, J., concurring).

In evaluating the plaintiff's evidence of pretext, we should "focus on the issue of the employer's discriminatory motives." Tymokovich, *supra*, at 517. We should be wary of allowing "categories of pretextual evidence [to] divert [our] attention . . . away from the ultimate issue in every case: whether the adverse employment decision resulted from the employer's unlawful discrimination." *Id*. at 518–19. Put another way, we should not "compartmentaliz[e]" evidence or "look[ ] at categories

of evidence narrowly." *Id.* at 519. Viewing the *totality* of the evidence, Torgerson and Mundell have identified *at least* three disputed issues of material fact as to whether the City's proffered nondiscriminatory justifications for not hiring them were pretextual. These disputed issues of fact are for the jury—not this court—to resolve. *See Quick*, 90 F.3d at 1376–77.

First, a reasonable jury could construe Commissioner Field's[10] comment regarding the SAFER grant as discriminatory. When Council Member Carr informed Commissioner Field that, by accepting the SAFER grant, the City "stipulated [that] you hire women and minorities," Commissioner Field replied, according to Council Member Carr, that "had I known, I would have recommended that the City not take the grant. He said [to Council Member Carr that] the City should never have taken the grant if that was the stipulation." The court usurps the jury's function by construing this comment in the light most favorable to the City, not Torgerson and Mundell. The court interprets Commissioner Field's comment as nondiscriminatory because "Congress explicitly commands that Title VII shall not be interpreted to require preferential treatment because of sex or national origin on account of an imbalance in the number or percent of those employed, compared to the relevant number or percent in the community." *See supra* Part II.C.1. Thus, according to the court, Commissioner Field's comment must be interpreted as merely evidencing his disagreement with the *mandatory* hiring of persons based on their sex or national origin. That may well be what he intended, but a reasonable jury with the benefit of cross-examined testimony from Commissioner Field could also interpret the comment as indicating that Commissioner Field was opposed to hiring women and minorities under any circumstances, mandatory or otherwise. Ultimately, a jury—not this court—should determine Commissioner Field's intended meaning. *See Quick*, 90 F.3d at 1376–77.

_____

[10]While the court expresses its doubt that Commissioner Field was a decisionmaker in the hirings, it assumes that he was a decisionmaker, noting that "Commissioner Field did vote to certify the ranked eligibility list, signed 10 (of 15) recommendation forms, participated in Commission meetings during the process, and many acts were done in the name of all three Commissioners, including him." *See supra* Part II.C.1.

Delving into Commissioner Field's thought processes and explaining away his comment so as to avoid any inference of discriminatory animus is inappropriate and in direct conflict with the summary judgment standard.

Second, a reasonable jury could infer discriminatory animus from Fire Chief Kapler's comment that he found Torgerson and Mundell "unfit." Fire Chief Kapler made the statement to Council Member Carr at a June 2006 meeting to discuss hiring more firefighters. Carr opined that the City should not hire anyone else under the SAFER grant, lest a minority candidate not hired hail the City to court. Fire Chief Kapler allegedly responded that he interviewed Torgerson and Mundell and "found them unfit." The court "credits Carr's testimony that three months after the hirings, Fire Chief Kapler said, 'I found them unfit.'" *See supra* Part II.E.4.

Viewing the facts in Torgerson and Mundell's favor, the court also concludes that they have "demonstrate[d] an admission by Kapler that, to quote their brief, 'they were not mentally or physically fit for duty, even though they had passed the required physical agility test and the City's background check.'" *Id*. But while the court admits that "Torgerson and Mundell have identified a factual dispute," it concludes that this "dispute as to what Kapler said to Carr is not material" because "[e]veryone involved in this case—Torgerson, Mundell*, and* all the City officials, *except Kapler once* (according to Carr)—agreed that they were qualified to be firefighters." *Id*. (emphasis added in part). This statement indicates precisely *why* Fire Chief Kapler's purported comment *is* material—because Fire Chief Kapler, on at least one occasion, commented that Torgerson and Mundell, both minority candidates, were "unfit" in discussing the recent hirings, the SAFER grant, and the protected-group candidates. In his deposition, Fire Chief Kapler skirted the issue of why he might have called Torgerson and Mundell "unfit," merely explaining how he "use[s] the word fit" without then applying that definition to Torgerson and Mundell. He then admitted that "they're on our list as qualified candidates, so, yes, they're qualified to be firefighters."

Fire Chief Kapler's intent in using the term "unfit" and its intended meaning are questions of fact for the jury to determine. At oral argument, the City's counsel argued that Fire Chief Kapler

> explained [in his deposition] that the term "fitness" is used in [Minnesota's] civil service statute that talks about full examinations of candidates to determine their relative fitness for positions, firefighter positions, and he explained [that] he used the term "fit," meaning "fit for the final three and the rule of three to be certified," not meaning that they were "unqualified."

When asked where in the record Fire Chief Kapler explained the use of the term "unfit" in terms of the rule of three, counsel conceded that Fire Chief Kapler did not cite the rule of three. Before a jury, the City's counsel would be free to argue to a jury that this was Fire Chief Kapler's intent in using the term "unfit." But on a motion for summary judgment, the court should not credit Fire Chief Kapler's proffered explanation of his use of the word. Moreover, Fire Chief Kapler never explained why, *during a discussion of the SAFER grant and protected-group candidates*, he might have referred to Torgerson and Mundell as "unfit" even though—by his own admission—they are "qualified." Torgerson and Mundell are entitled to reasonable inferences drawn in their favor. A jury—not this court—should determine the meaning and credibility of Fire Chief Kapler's explanation after a trial on the merits.

Third, a reasonable jury could draw an inference of sex discrimination from Commissioner Withers's purported comment that he wanted to hire Candidate 3—the convicted felon—because "he was the absolute big, strong firefighter type" or "he was a big guy and that he'd make a good firefighter." The district court concluded that Commissioner

> Withers made the statement while justifying the appointment of a convicted felon to a firefighter position. Withers's statement *is devoid of*

-38-

*reference to women*, and according to Carr, Withers did not indicate that he had any concerns about a female's ability to meet the physical demands of firefighting. Wither[s]'s observation that a candidate was a "big guy" and assessment of the candidate's potential as a firefighter in defense of the decision to appoint the candidate is not evidence of discriminatory animus toward women.

(Emphasis added.) Similarly, the majority concludes that "[t]he 'big guy' statement does not relate to Mundell, or to the abilities of female applicants, and thus is not direct evidence of discrimination." Part II.C.2.

But Commissioner Withers's comment, *on its face*, references *gender*, as he purportedly stated that Candidate 3 "was a big guy." Undisputedly, Mundell *is not* a "big guy." A jury could certainly infer that Withers's comment was harmless and made during a conversation defending the hiring of Candidate 3. But a jury could also reasonably infer a discriminatory animus from the comment, reasonably construing the comment as indicating that Commissioner Withers's idea of a model "firefighter type" is a "big, strong" "guy."

"[W]eigh[ing] the evidence, mak[ing] credibility determinations, [and] attempt[ing] to determine the truth of the matter" is the function of the jury. *Quick*, 90 F.3d at 1376–77. Here, the court has usurped the jury's role by conclusively resolving disputed genuine issues of material fact. Looking at the evidence as a whole—and not considering each piece of evidence in a vacuum—I find that Torgerson and Mundell have produced sufficient evidence that material fact issues remain as to whether the City's reasons for not hiring them were pretextual. Summary judgment serves an important efficiency function by resolving cases lacking material factual dispute by more efficient means than a trial. However, where material factual disputes exist, especially those which turn on evaluation of witness credibility, it is no injustice to permit the matter to be tried.

-39-

Accordingly, I would affirm the district court's dismissal of Torgerson's § 1981 claim but reverse the grant of summary judgment on Torgerson and Mundell's Title VII claim and remand to the district court for further proceedings.

_____

## Appendix

*Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1082 (8th Cir. 2010) ("sparingly," "very close," affirming).

*Chism v. Curtner*, 619 F.3d 979, 983 (8th Cir. 2010) ("sparingly," affirming).

*Colenburg v. Starcon Int'l, Inc.*, 619 F.3d 986, 992 (8th Cir. 2010) ("sparingly," affirming).

*Wisbey v. City of Lincoln*, 612 F.3d 667, 671 (8th Cir. 2010) ("sparingly," "particularly deferential to the nonmovant," affirming).

*Dixon v. Pulaski County Special Sch. Dist.*, 578 F.3d 862, 867 (8th Cir. 2009) ("sparingly," affirming).

*Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 871 (8th Cir. 2008) ("seldom," affirming).

*King v. Hardesty*, 517 F.3d 1049, 1057 (8th Cir. 2008) ("sparingly," affirming in part, reversing in part).

*Devin v. Schwann's Home Serv., Inc.*, 491 F.3d 778, 785 (8th Cir. 2007) ("seldom," affirming).

*Higgins v. Gonzales*, 481 F.3d 578, 584 (8th Cir. 2007) ("seldom," affirming).

*Arnold v. Nursing & Rehab. Ctr. at Good Shepherd, LLC*, 471 F.3d 843, 845-46 (8th Cir. 2006) ("sparingly," affirming).

*Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1117, 1118 (8th Cir. 2006) ("sparingly," "with caution," reversing).

*Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005) ("disfavored," affirming).

*Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 873 (8th Cir. 2005) ("seldom," affirming).

*Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 850 (8th Cir. 2005) ("seldom," affirming).

*Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1034-35 (8th Cir. 2005) ("seldom," affirming in part, reversing in part).

*Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1006 (8th Cir. 2005) ("seldom," affirming).

*Peterson v. Scott County*, 406 F.3d 515, 520 (8th Cir. 2005) ("seldom," affirming in part, reversing in part).

*Williams v. Missouri Dep't of Mental Health*, 407 F.3d 972, 975 (8th Cir. 2005) ("seldom," affirming).

*Stidham v. Minnesota Mining & Mfg., Inc.*, 399 F.3d 935, 937 (8th Cir. 2005) ("seldom," affirming).

*Woods v. Perry*, 375 F.3d 671, 674 (8th Cir. 2004) ("sparingly," affirming).

*Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1024 (8th Cir. 2004) ("seldom," affirming).

*Wheeler v. Aventis Pharm*., 360 F.3d 853, 857 (8th Cir. 2004) ("with caution," affirming).

*Turner v. Honeywell Fed. Mfg. & Techs., LLC*, 336 F.3d 716, 720 (8th Cir. 2003) ("sparingly," affirming).

*Mayer v. Nextel W.Corp.*, 318 F.3d 803, 806 (8th Cir. 2003) ("seldom," affirming).

*EEOC v. Liberal R-II Sch. Dist.*, 314 F.3d 920, 922 (8th Cir. 2002) ("seldom," reversing).

*Jacob-Mua v. Veneman*, 289 F.3d 517, 520 (8th Cir. 2002) ("cautiously granted," affirming).

*EEOC v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) ("particularly deferential to the nonmovant," affirming).

*Luciano v. Monfort, Inc.*, 259 F.3d 906, 908 (8th Cir. 2001) ("sparingly," affirming).

*Simmons v. New Pub. Sch. Dist. No. Eight*, 251 F.3d 1210, 1218 (8th Cir. 2001) ("sparingly," reversing).

*Heaser v. Toro Co.*, 247 F.3d 826, 830 (8th Cir. 2001) ("seldom," affirming).

*Bradley v. Widnall*, 232 F.3d 626, 630-31 (8th Cir. 2000) ("sparingly," affirming).

*Mems v. City of St. Paul*, 224 F.3d 735, 738 (8th Cir. 2000) ("seldom," reversing in part, affirming in part).

*Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000) ("sparingly," affirming).

*Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000) ("particularly deferential" to the nonmovant, affirming).

*Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 830 (8th Cir. 2000) ("seldom," reversing in part, affirming in part).

*Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir. 2000) ("seldom," reversing) (citing cases).

*Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999) ("particularly deferential" to the nonmovant, reversing).

*Keathley v. Ameritech Corp.*, 187 F.3d 915, 919 (8th Cir. 1999) ("seldom," affirming in part, reversing in part).

*Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999) ("seldom," affirming in part, reversing in part).

*Lynn v. Deaconess Med. Ctr.-W. Campus*, 160 F.3d 484, 486-87 (8th Cir. 1998) ("seldom," reversing).

*Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir. 1998) ("seldom," reversing).

*Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1205 (8th Cir. 1997) ("seldom," "particularly deferential" to the nonmovant, affirming).

*Duffy v. Wolle*, 123 F.3d 1026, 1033 (8th Cir. 1997) ("seldom," affirming).

*Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 615-16 (8th Cir. 1997) ("seldom," affirming).

*Chock v. Nw. Airlines, Inc.*, 113 F.3d 861, 862 (8th Cir. 1997) ("sparingly," affirming).

*Smith v. St. Louis Univ.*, 109 F.3d 1261, 1264 (8th Cir. 1997) ("seldom," reversing).

*Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 486 (8th Cir. 1996) ("particularly deferential" to party alleging discrimination, reversing).

*Landon v. Nw. Airlines, Inc.*, 72 F.3d 620, 624 (8th Cir. 1995) ("sparingly," affirming in part, reversing in part).

*Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 240 (8th Cir. 1995) ("seldom," affirming).

*Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759, 762 (8th Cir. 1995) ("seldom," affirming).

*Davis v. Fleming Cos., Inc.*, 55 F.3d 1369, 1371 (8th Cir. 1995) ("sparingly," reversing).

*Oldham v. West*, 47 F.3d 985, 988 (8th Cir. 1995) ("seldom," reversing).

*Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir. 1995) ("sparingly," reversing).

*Weissman v. Congregation Shaare Emeth*, 38 F.3d 1038, 1045 (8th Cir. 1994) ("seldom," reversing).

*Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) ("seldom," reversing in part, affirming in part).

*Gill v. Reorganized Sch. Dist. R-6*, 32 F.3d 376, 378 (8th Cir. 1994) ("with caution," affirming).

*Sweeney v. City of Ladue*, 25 F.3d 702, 703 (8th Cir. 1994) ("seldom," affirming).

*Kehoe v. Anheuser-Busch, Inc.*, 995 F.2d 117, 120 (8th Cir. 1993) ("very close," reversing).

*Weber v. Am. Express Co.*, 994 F.2d 513, 515-16 (8th Cir. 1993) ("seldom," affirming).

*Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244-45 (8th Cir. 1991) ("seldom," "sparingly," affirming in part, vacating in part).

*Haglof v. Nw. Rehab., Inc.*, 910 F.2d 492, 494-95 (8th Cir. 1990) ("seldom," reversing).

*Hillebrand v. M-Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir. 1987) ("sparingly," "seldom," affirming in part, reversing in part).

_____