# United States Court of Appeals

## For the Eighth Circuit

_____

No. 17-2492

_____

Walter Engelhardt

*Plaintiff - Appellant*

v.

Qwest Corporation; Tim Buchholz

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 18, 2018
Filed: March 22, 2019

_____

Before SMITH, Chief Judge, LOKEN and GRUENDER, Circuit Judges.

_____

SMITH, Chief Judge.

Plaintiff Walter Engelhardt sued Qwest Corporation, a subsidiary of CenturyLink, and Tim Buchholz, CenturyLink's operations director, alleging that CenturyLink and Buchholz terminated him in violation of the Fair Labor Standards Act (FLSA) and the Minnesota Whistleblower Act (MWA). He also sued for tortious interference with a prospective business relationship. Engelhardt claimed that CenturyLink and Buchholz terminated him in retaliation for legal action he had taken

against the company. CenturyLink and Buchholz averred that they terminated Engelhardt for low productivity. The district court[1] granted summary judgment in favor of the defendants and dismissed the MWA claim for lack of standing. On appeal, Engelhardt argues that the district court erred in granting summary judgment because genuine issues of material fact remain as to CenturyLink and Buchholz's motives for terminating him; he also claims the district court erred in finding he lacked standing under the MWA. We disagree and affirm the district court's judgment.

## I. *Background*

Engelhardt began working for CenturyLink as a St. Paul-based technician in 2000. In 2007, he joined a class action lawsuit ("the *Brennan* lawsuit") of over 300 employees against the company. The suit settled, and Engelhardt received a payment. Then, in 2008, CenturyLink terminated Engelhardt for low productivity.

In 2011, Engelhardt applied for work through MP Nextlevel (MP). MP supplies contractors to telecommunications companies, including CenturyLink. MP initially placed Engelhardt with a company in Big Lake, Minnesota, but Engelhardt requested a transfer to CenturyLink in St. Paul. While the transfer was pending, Engelhardt's former CenturyLink supervisor Chris Fry noticed Engelhardt's request. Fry then notified his superior, Tim Buchholz, of Engelhardt's impending return. Fry expressed confusion about how a terminated employee could return to the company as a contractor.

Six days after Engelhardt's assignment to CenturyLink through MP, Buchholz released Engelhardt. Buchholz terminated Engelhardt after seeing his name on the company's "Do Not Rehire" list. This list contained names of employees who had

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

been fired for workplace violations, including productivity and performance issues. CenturyLink placed former employees' names on the list if they were fired for a qualifying reason. These employees would be marked as "not rehirable" in the CenturyLink system. Fry testified he believed Engelhardt had been marked as "not rehirable" after his termination because of low productivity.

About a month after being released, Engelhardt contacted Buchholz and threatened to sue CenturyLink for retaliation. Engelhardt believed he was being punished for his participation in the *Brennan* lawsuit. Buchholz and Engelhardt communicated over the course of several weeks. After investigating the matter, Buchholz informed Engelhardt on a Friday that he had been cleared to return to work as a contractor. The following Monday, an MP employee accidentally sent an e-mail to Engelhardt claiming that "[a CenturyLink employee] told me on Friday that he or anyone else at Century Link will have no contact with Walt." Decl. of Charles A. Delbridge, Ex. 16, at 135, *Engelhardt v. Qwest*, No. 0:15-cv-04591-ADM-SER (D. Minn. Feb. 16, 2017), ECF No. 27-1. Two days later, however, that same employee reassured Engelhardt that he had indeed been cleared to return as a contractor. Because of the approaching seasonal slow down, Engelhardt did not ever actually report to CenturyLink. The company laid off all its contractors for the winter shortly after Buchholz cleared Engelhardt to return.

That next year, in 2012, Engelhardt moved to North Dakota and did not reapply to work as a CenturyLink contractor. In 2015, however, a friend of Engelhardt's informed him that CenturyLink was hiring technicians and suggested he apply. Skeptical, Engelhardt contacted former associates at CenturyLink and MP. In response to Engelhardt's inquiries, Fry told Engelhardt's former union steward that Engelhardt was welcome to come back. MP supervisor Tedd Elliot personally assured Engelhardt there was nothing in his employment file that should impede his return. A CenturyLink manager reporting to Buchholz also told Elliot there was no reason Engelhardt should not be able to return.

That summer, MP rehired Engelhardt, and he was assigned to work as a CenturyLink contractor. In mid-August, however, a little over a week into the job, Brian Burth contacted Fry asserting Engelhardt's productivity was low. Burth had been hired by CenturyLink in June 2015 and was in charge of monitoring contractor performance. Burth averred that he had not been aware of Engelhardt's prior relationship with the company when he contacted Fry about Engelhardt's issues.

Burth's e-mail to Fry listed the number of jobs Engelhardt had completed each day. Burth considered this number unsatisfactory and suggested terminating Engelhardt. The list revealed that Engelhardt was completing about three jobs per day. Burth stated that he expected technicians to complete five to six jobs per day.

Fry forwarded Burth's e-mail to CenturyLink's contractor liaison, Rennell Schank, and copied his supervisor, Buchholz. Fry explained that Engelhardt's production levels were low, that he was allegedly calling CenturyLink employees for assistance, and that he was "returning work to himself for future dates, and working at a pace that needs to be addressed." Decl. of Charles A. Delbridge, Ex. 17, at 137, *Engelhardt v. Qwest*, No. 0:15-cv-04591-ADM-SER (D. Minn. Feb. 16, 2017), ECF No. 27-1. At his deposition, Burth stated that calling CenturyLink employees was problematic because CenturyLink's employees were unionized and did not appreciate being contacted by the non-unionized contractors.

About a half hour after Fry sent his e-mail, Buchholz responded, "Send him home . . . " *Id.* (ellipsis in original). Buchholz estimated he deliberated for about 60 seconds before recommending Engelhardt's termination. A few minutes after Buchholz sent his e-mail, Schank thanked Fry for the information and stated she would have someone send Engelhardt home. Buchholz stated that he had previously directed the release of contractors who had spent less than two weeks on the job.

After his termination, Engelhardt sued CenturyLink and Buchholz in federal district court. He alleged that CenturyLink and Buchholz terminated him in violation

-4-

of the FLSA and the MWA. He also sued for tortious interference with a business relationship. Engelhardt claimed that CenturyLink and Buchholz terminated him in retaliation for his involvement in the *Brennan* suit and for his threatened action against Buchholz following his 2011 termination. CenturyLink and Buchholz denied retaliation and stated that they terminated Engelhardt for low productivity.

The district court granted summary judgment in favor of the defendants. The district court assumed without finding that Engelhardt could establish a prima facie case of retaliation. The court then held, however, that Engelhardt presented insufficient evidence of pretext to defeat CenturyLink and Buchholz's legitimate, nonretaliatory reason for terminating him. The court further found that, as a contractor rather than an employee, Engelhardt lacked standing under the MWA. The court also found no tortious interference.

## II. *Discussion*

On appeal, Engelhardt avers that the district court erred in granting summary judgment because genuine issues of material fact remain as to CenturyLink and Buchholz's motives for terminating him. Engelhardt also claims the district court erred in holding he lacked standing under the MWA and in dismissing his tortious interference claim.

"We review the district court's grant of summary judgment de novo, examining the record in the light most favorable to [Engelhardt] to determine whether there are genuine issues of material fact." *Humann v. KEM Elec. Co-op., Inc.*, 497 F.3d 810, 812 (8th Cir. 2007). Nevertheless, a plaintiff seeking to defeat summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with '*specific facts* showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8thCir. 2011) (en banc) (emphasis added) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

### 1. *FLSA Retaliation Claim*

We analyze FLSA retaliation claims "under the familiar *McDonnell-Douglas* burden-shifting framework." *Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 828 (8th Cir. 2013). Once a plaintiff establishes a prima facie case of retaliation, the defendant has the burden of "com[ing] forward with evidence of a legitimate, nonretaliatory basis for the adverse employment action." *Fezard v. United Cerebral Palsy of Cent. Ark.*, 809 F.3d 1006, 1011 (8th Cir. 2016). If the defendant proffers a basis, the burden shifts to the plaintiff, and the plaintiff must provide evidence that the employer's proffered basis is pretextual. *Id.*

"To demonstrate pretext, the employee must show that the employer's proffered reason is unworthy of credence. To show pretext, the plaintiff must demonstrate more than at the prima facie stage because, at the pretext stage, the evidence is viewed in light of the employer's justification." *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) (cleaned up). "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1125–26 (8th Cir. 2017) (cleaned up).

> In proving pretext by showing that similarly situated employees were treated more leniently, the plaintiff's comparators must be similarly situated in all relevant respects. The comparators must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances. The comparators need not have committed the exact same offense but must have engaged in conduct of comparable seriousness.

*Ebersole*, 758 F.3d at 925 (cleaned up).

Here, once CenturyLink and Buchholz proffered Engelhardt's lack of productivity as their reason for terminating him, it became incumbent upon Engelhardt to produce evidence showing that this legitimate, nonretaliatory explanation was pretextual. *See Fezard*, 809 F.3d at 1011. To survive summary judgment, Engelhardt needed to come forward with "specific facts" showing genuine uncertainty about whether the defendants used productivity as a pretext for retaliation. *See Torgerson*, 643 F.3d at 1042 (quoting *Celotex Corp.*, 477 U.S. at 324). Engelhardt has not produced those facts. Instead, his argument relies on unsubstantiated allegations and untenable inferences.

Engelhardt asserts that "Buchholz held a grudge against [him] for his participation in the [2007] *Brennan* Lawsuit, and—after his 2011 termination—for threatening another lawsuit against CenturyLink." Appellant's Br. at 48. According to Engelhardt, Buchholz then acted on that grudge by directing his 2015 termination. Engelhardt's lawsuit does not directly contest his 2008 or 2011 terminations; rather, he contends that his 2015 termination arose from his activities in 2007 and 2011.[2]

As evidence of this "grudge," Engelhardt offers the circumstances of his 2011 termination. Essentially, Engelhardt presents his 2011 communication with CenturyLink and Buchholz—including his threatened lawsuit—as evidence that Buchholz harbored animus towards him in 2015. Engelhardt also suggests Buchholz has maintained ill-will towards him since 2011, and he questions the sincerity of Buchholz's statement that he was cleared to return to CenturyLink following his 2011 complaints. Engelhardt admitted during his deposition that he had no evidence "whatsoever" that Buchholz had been untruthful about his rehiring. Decl. of Charles A. Delbridge, Ex. 1, at 9, *Engelhardt v. Qwest*, No. 0:15-cv-04591-ADM-SER (D. Minn. Feb. 16, 2017), ECF No. 27-1. Nonetheless, Engelhardt now maintains the

---

[2] The statute of limitations for FLSA claims is typically two years, but, in the case of a willful violation, it extends to three years. 29 U.S.C. § 255(a).

mistakenly-forwarded e-mail from the MP employee creates a question of fact as to whether Engelhardt was truly cleared to return. We disagree.

Notwithstanding the e-mail's claim to the contrary, CenturyLink did, in fact, both maintain contact with Engelhardt and clear him to return. Buchholz himself contacted Engelhardt and cleared him to return as a contractor. The e-mail's sender also contacted Engelhardt *after* forwarding the e-mail to reassure Engelhardt that he had been cleared. Engelhardt was not able to return in 2011 because of a seasonal slow-down in work, not because of Buchholz's alleged animus. It is undisputed that CenturyLink released its entire contract workforce for the winter in November 2011. Engelhardt speculates CenturyLink did so to avoid rehiring him, but there is no evidence in the record to suggest the November 2011 terminations emanated from something other than the company's annual business cycle. On this record, no reasonable jury could conclude that CenturyLink released its entire contractor workforce simply to avoid rehiring Engelhardt.

Engelhardt also maintains that Buchholz held an enduring "grudge" against him evidenced by Buchholz's involvement in Engelhardt's 2015 termination after only two weeks. Essentially, Engelhardt argues that the unusual timing and manner of his termination suggest an improper motive. However, Buchholz testified to terminating contractors after just two weeks in the past, and Engelhardt—who bears the burden of production at this stage—has produced no evidence to the contrary. Neither has Engelhardt produced evidence to counter Buchholz's claim that he had not even recognized Engelhardt's name when he directed his termination; as the district court noted, Buchholz supervised a workforce of about 325 employees and a contractor workforce with near 100 percent yearly turnover, lending credence to this assertion. Buchholz's involvement in Engelhardt's termination alone does not prove retaliatory intent. The record simply does not support Engelhardt's "grudge" theory.

The record, however, does support CenturyLink and Buchholz's claim that Engelhardt was insufficiently productive, and that this, rather than a "grudge," played the key role in his release. Burth, Fry and Buchholz all cited Engelhardt's productivity as the primary reason for his termination. Burth's initial e-mail to Fry included a breakdown of Buchholz's completed jobs, indicating that Engelhardt was falling far short of the expected five to six jobs per day. During the last five days of his employment, Engelhardt completed no more than two or three jobs per day, with a low of two jobs in eleven hours the Thursday preceding his Tuesday termination. Engelhardt's low productivity so concerned Burth that he himself suggested terminating Engelhardt in the e-mail to Fry—well before Buchholz became involved. Engelhardt has not challenged the accuracy of Burth's numbers. And he has stated that he has no reason to believe that Burth—who began working at CenturyLink years after both the *Brennan* suit and Engelhardt's first stint as a contractor—was being dishonest or malicious. Considering the uncontroverted evidence of Engelhardt's low productivity, Engelhardt has failed to demonstrate pretext by any of the means described in *Edwards*, or by any other means. *See Edwards*, 860 F.3d at 1125–26.

Additionally, Engelhardt has not identified any similarly situated employees who were treated differently. Specifically, he has not identified any contractors with similarly low productivity who have not been terminated. And he has not shown that CenturyLink and Buchholz's explanation for his termination has shifted. Though the exact phraseology has changed from person to person—Burth described Engelhardt as "not contributing to the workload," while Fry stated he was "working at a pace that needs to be addressed"—the defendants have consistently maintained Engelhardt was an unproductive worker. Decl. of Charles A. Delbridge, Ex. 17, at 137–38. The various reasons stated in justification of Engelhardt's termination are not contradictory. Neither Engelhardt's late dispatching nor his calls to employees undermine the core rationale of poor production. Finally, Engelhardt's attempts to demonstrate pretext by casting Buchholz as a vengeful and vindictive supervisor fail for lack of evidence.

## 2. *State Law Claims*

The MWA prohibits retaliation against an "employee" for reporting in good faith "a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." Minn. Stat. §181.932, subd. 1(1). "Employee" explicitly excludes "independent contractors." *Id.* §181.931, subd. 2.

Engelhardt disputes the district court's finding that, as a CenturyLink contractor, he lacked standing to sue under the MWA. To defeat this finding, Engelhardt claims for the first time on appeal that MP and Century Link were "joint employers" and that he was an "employee" of both MP and Century Link. As a rule, this court "do[es] not entertain new arguments on appeal from the grant of summary judgment." *United States v. Mannis*, 186 F.3d 863, 864 (8th Cir. 1999) (per curiam). We decline to do so here.

Because CenturyLink and Buchholz have not violated federal or state law, and because their interference was not independently tortious, Engelhardt's tortious interference with prospective business relations claim fails as well. *See Giseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219–20 (Minn. 2014) (holding that, to succeed on a tortious interference claim, "a plaintiff must prove . . . that the defendant's tortious interference was intentional and either independently tortious or in violation of a state or federal statute or regulation").

## III. *Conclusion*

For the foregoing reasons, we affirm the judgment of the district court.

_____